## TALBOTT *v.* SILVER BOW COUNTY.

### APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF MONTANA.

No. 221. Submitted March 12, 1891. — Decided March 30, 1891.

The territories possess the same power of taxing national banks which States enjoy.

Section 1003 of chapter 53 of the fifth division of the Revised Statutes of Montana Territory, as amended by the Act of February 22, 1881, Laws of 1881, p. 67, is not in conflict with Rev. Stat. § 5219.

Under the general Territorial system, as expressed in the various organic acts, the power of taxation is absolute, save as restricted by the Constitution or congressional enactments.

THE case is stated in the opinion.

*Mr. James W. Forbis* for appellant.

*Mr. J. II. McGowan* for appellee.

Mr. Justice Brewer delivered the opinion of the court.

This case was submitted to the District Court of the Second Judicial District of Montana Territory, on the following agreed statement of facts:

"1. That the First National Bank of Butte is now and was during all of the year 1885 and before that time a corporation duly created under and by virtue of the laws of the United States relating to national banks, and located and carrying on a general banking business in Butte City, in said county of Silver Bow and Territory of Montana, and that the capital stock of said bank is one hundred thousand dollars, divided into one thousand shares of one hundred dollars each.

"2. That during all of said year 1885 the said defendant, Andrew J. Davis, was the owner and holder of nine hundred and forty shares of the capital stock of said bank, and that said shares were during all of said year and are now of the true value in money at private sale and of the market value (which is the same) of one hundred and twenty-five dollars each.

"3. That for and in the said year 1885 there was duly levied and assessed, according to the laws of Montana Territory, in said Silver Bow County, for Territorial, county and other purposes, upon all property in said county subject to taxation, an ad valorem tax amounting in all to thirteen and three-tenths mills on each dollar of assessed valuation.

"4. That said nine hundred and forty shares of stock of the said the First National Bank of Butte were assessed for taxation, in the manner prescribed by the laws of said Montana Territory for said year 1885, to said defendant, Andrew J. Davis, (who then owned and held said shares in said county of Silver Bow,) at their estimated true value in money at private sale and at their market value (which is the same); that said defendant has not, nor has said bank, or any one for him or it, ever paid said tax on said shares so assessed as aforesaid or any part of said tax.

"5. That in the general assessment in said Silver·Bow County for said year 1885 shares of stock in corporations generally were assessed in accordance with the provisions of section 1003 of chapter LIII of the fifth division of the Revised Statutes of Montana Territory, as amended by the act of the legislature of February 22, 1881, on page 67 of the laws·of 1881, and where the entire capital stock of any incorporated company was invested in ·assessable property in said Territory, such stock or the shares thereof were not taxed, and that mining claims not held under patent from the United States were not assessed or taxed at all, and where held under patent from the United States were assessed at the government price of five dollars per acre without regard to their market value; that there are a large number of mining corporations in Montana Territory whose entire capital stock is. invested in assessable property, and that part of said property consists of mining claims."

And upon these facts the following questions were presented :

"1. Under the laws of the United States and of the Territory of Montana are shares of stock in national banks located in said Territory subject to taxation at all?

"2. Upon the facts in this case was the said assessment and taxation of said shares of stock to defendant in violation of or in conflict with the restriction contained in section 5219 of the Revised Statutes of the United States relating to the taxation of shares of national banks, and providing that such taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of the individual citizens of the Territory?"

In the District Court these questions were determined in favor of the plaintiff, the county commissioners, and this decision was affirmed by the Supreme Court of the Territory. The case is now here on appeal.

That shares of stock in a national bank are not subject to taxation without the consent of Congress is conceded. *McCulloch* v. *Maryland*, 4 Wheat. 316; *Osborn* v. *Bank of the United States*, 9 Wheat. 738; *Weston* v. *Charleston*, 2 Pet. 449; *Peo-*

*ple* v. *Weaver*, 100 U. S. 539. And the contention is, that Congress has given consent to taxation thereof only by States and has not extended like privileges to a Territory. Section 5219 of the Revised Statutes contains the declaration of Congress in respect to this matter. It reads:

" SECTION 5219. Nothing herein shall prevent all the shares in any association from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the State within which the association is located; but the legislature of each State may determine and direct the manner and place of taxing all the shares of national banking associations located within the State, subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such State, and that the shares of any national banking association owned by non-residents of any State shall be taxed in the city or town where the bank is located, and not elsewhere. Nothing herein shall be construed to exempt the real property of associations from either State, county, or municipal taxes, to the same extent, according to its value, as any other real property is taxed."

In this section no express reference is made to Territories; States only are mentioned. Tested by the letter, the argument is short and clear. Congressional permission is essential; no permission is given to the Territories; therefore, Territorial taxation is unauthorized and void. Whatever may be the voice of the letter, the argument fails because the minor premise cannot be sustained. Can it be that Congress meant to give power to the States to tax, and to withhold that power from the Territories? Some plausible reason should be suggested before the intention is imputed to Congress of granting to an independent jurisdiction, such as a State, the power to tax one of its own instrumentalities, and at the same time withholding a like power from a political organization like that of a Territory wholly dependent upon Congress, and subject to its absolute supervision and control. Such is not the ordinary lesson of experience. If the matter in respect to

which such an intent was imputed were wholly of interest to the States, or designed purely for the exercise of powers within the States, then properly all general expressions in the statute might be limited to States, and the intent of Congress be supported and established by the character of the subject-matter of the legislation. The converse of this is true. The national banking system was national in its design, coextensive in its operation with the territorial limits of the United States, and intended to be the banking system for the whole country, Territories as well as States. Section 5134 of the Revised Statutes, which provides for the incorporation of a national bank, requires in its second clause that its organization certificate shall state "the place where its operations of discount and deposit are to be carried on, designating the State, Territory or District, and the particular county and city, town or village." Section 5146 requires that "at least three-fourths of the directors must have resided in the State, Territory or District in which the association is located, for at least one year immediately preceding their election." Section 5178 provides that "one hundred and fifty millions of dollars of the entire amount of circulating notes authorized to be issued shall be apportioned to associations in the States, in the Territories and in the District of Columbia, according to representative population." Section 5180 provides for a statement showing the amount of circulation in each State and Territory, a withdrawal from those States having an excess of circulation, and that "the circulation so withdrawn shall be distributed among the States and Territories having less than their proportion, so as to equalize the same." Section 5197 authorizes the association to charge and receive "interest at the rate allowed by the laws of the State, Territory or District where the bank is located." Section 5239 provides for a forfeiture of the franchises of the banking association upon an adjudication of a violation of the act; "such violation shall, however, be determined and adjudged by a proper Circuit, District or Territorial court of the United States, in a suit brought for that purpose," etc. Section 5240 prescribes the compensation to be paid to examiners of banks "in the States of Oregon, California and Nevada or in the Territories."

These various provisions, scattered through the entire body of the statute respecting national banks, emphasize that which the character of the system implies — an intent to create a national banking system coextensive with the territorial limits of the United States, and with uniform operation within those limits, to establish everywhere throughout the United States banks with the security which a national examination gives, and furnish a currency of uniform value, the same in Arizona as in New York, in Territory as in State. Given a system of such national character, and such uniform and universal operation through the entire territorial limits of the country, before any particular section of the statute creating it shall be tortured into creating a discrimination and difference in privileges and burdens by reason of locality, its language must imperatively demand such construction. Were it claimed that it permitted local taxation east of the Alleghanies and forbade it west, even if the power of Congress in respect to such a discrimination were conceded, the section invoked to justify such a contention would have to be clear and imperative in its language. Differences arising from mere adaptation to local statutes is one thing, while discrimination by reason of locality, or political organization, is another, and essentially diverse. It does not conflict with the national character of the system that the banks of the various States and Territories may charge and receive a rate of interest allowed by the local statutes; that is merely the adaptation of the system to the laws and customs of the various States; but it would militate much against its national character if banks organized under it were subjected to local taxation in one part of the Union, and exempted from it elsewhere. No such intent ought lightly to be imputed to Congress.

Further it is a general rule in the construction of statutes that when in the earlier and declaratory sections the scope and extent of the power and privileges granted are once stated, the character of the grant as thus disclosed controls and interprets all subsequent sections; and it is unnecessary in each subsequent section to restate or use words and expressions which shall fully disclose the extent of those powers and privi-

leges; but these subsequent sections will be understood, (unless there be words of restriction and limitation therein,) as coextensive with and applicable to the scope, and the full scope, and extent of the powers theretofore granted. So when, in the sections providing for the incorporation of national banks, the thought of their existence in States and Territories alike is affirmed, the character and extent of the banking system are disclosed; and subsequent sections must be taken to be in support, rather than in derogation, of the national feature of this national system.

Still further, while the word State is often used in contradistinction to Territory, yet in its general public sense, and as sometimes used in the statutes and the proceedings of the government, it has the larger meaning of any separate political community, including therein the District of Columbia and the Territories, as well as those political communities known as States of the Union. Such a use of the word State has been recognized in the decisions of this court. Thus, in the early case of *Hepburn* v. *Ellzey*, 2 Cranch, 445, 452, Chief Justice Marshall observed: " On the part of the plaintiffs it has been urged that [the District of] Columbia is a distinct political society; and is, therefore, ' a State,' according to the definitions of writers on general law. This is true." In *Metropolitan Railroad* v. *District of Columbia*, 132 U. S. 1, 9, Mr. Justice Bradley, speaking for the court, declared that " it is undoubtedly true that the District of Columbia is a separate political community in a certain sense, and in that sense may be called a State." And in the case of *Geofroy* v. *Riggs*, 133 U. S. 258, 268, a similar construction was given to the use of the word " State," and in a clause which seemed on the face to carry a narrower meaning than the language used in section 5219, *supra*. The clause was found in a treaty between France and the United States, and that clause was as follows: " In all the States of the Union, whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States." On the face of

the language, the word "State" would seem to refer, not to political communities in general, but to those particular communities which form the States of the Union; yet it was held to include the District of Columbia, this court, by Mr. Justice Field, observing: "This article is not happily drawn. It leaves in doubt what is meant by 'States of the Union.' Ordinarily these terms would be held to apply to those political communities exercising various attributes of sovereignty which compose the United States, as distinguished from the organized municipalities known as Territories and the District of Columbia. And yet separate communities, with an independent local government, are often described as States, though the extent of their political sovereignty be limited by relations to a more general government or to other countries. Halleck on Int. Law, c. 3, §§ 5, 6, 7. The term is used in general jurisprudence and by writers on public law as denoting organized political societies with an established government. Within this definition the District of Columbia, under the government of the United States, is as much a State as any of those political communities which compose the United States."

But the argument does not rest here. Upon what principle is the power of a State to tax a national bank, without the consent of Congress, denied? The answer to this question was fully given by Chief Justice Marshall in the cases of *McCulloch* v. *Maryland* and *Weston* v. *Charleston, supra.* Briefly stated, the argument was this: Two distinct sovereignties, the State and the United States, exercise jurisdiction within the same territorial limits. Each has the power of taxation. This power is in its nature absolute and unlimited. Power to tax is power to destroy. Given to the State the power to tax any of the instrumentalities which the United States creates for the exercise of its jurisdiction, and the former may impede, if not wholly stop, the latter in the discharge of its duties as sovereign. Hence, by necessary implication, the absolute exemption from state taxation of any of the instrumentalities — and among them are national banks, which the United States creates for the exercise of its powers and the discharge of its duties. But the whole argument fails

when applied to a Territory. It is not a distinct sovereignty. It has no independent powers. · It is a political community organized by Congress, all whose powers are created by Congress, and all whose acts are subject to Congressional supervision. Its attitude to the general government is no more independent than that of a city to the State in which it is situated, and which has given to it its municipal organization. Who would contend, in the absence of express legislative provision therefor, that a bank created by or under the laws of a State, and located and doing business in a city of that State, could claim exemption from municipal taxation upon its property ? A bank is an institution organized for private business, and with a view to individual profit, although it may serve a public purpose and such public purpose justify its creation ; and no such private corporation has any implied exemption from local taxation by a municipal or political organization in which it is situated. The only ground on which exemption from such taxation can be based, in the absence of express legislative provision, is that the tax proceeds from a distinct and independent sovereignty. As the reason for the rule of exemption of a national bank from state taxation fails in respect to a bank located in a Territory, the rule also fails.

From these several considerations we conclude that there was no error in this ruling of the Supreme Court of the Territory of Montana, and that the same power of taxation in respect to national banks exists in the Territories that. does in the States. We pass, therefore, to the second question presented, and that is whether the rule of assessment prescribed by the statute and adopted in this case was in violation of the restrictions contained in said section 5219.

The Montana statute, chapter 53, section 1003, supposed to conflict with the Federal statute, is as follows :

"SECTION 1003. All other property, real or personal, within the Territory, ·is subject to taxation in the manner herein directed, and this is intended to embrace improvements on lands and lots in towns, including land bought from the United States and from this Territory, whether bought on credit or otherwise, being franchises which, for the purpose of this

chapter, are to be considered real property; ditches and flumes, horses, oxen and other cattle, except calves under eight months old, which shall be exempt from taxation; mules and asses, sheep, swine and goats; money in coin or gold dust, whether in possession or on deposit, and including bank bills; property or labor due from solvent debtors on contract or on judgment, whether in this Territory or not; mortgages and other like securities; stocks or shares in any bank or company, incorporated or otherwise, and whether incorporated by this or any other Territory or not, except that where the entire capital stock of any incorporated company shall be invested in assessable property in the Territory of Montana, such stock shall not be taxed; public stock or lands; household furniture not otherwise exempt, including gold and silver plate, musical instruments, watches and jewelry; pleasure carriages, stages, hacks and other vehicles for transporting passengers; wagons, carts, drays, sleds and other descriptions of vehicles or carriages; boats and vessels of every description, whenever registered or licensed, and whether navigating the waters of this Territory or not, if owned either in whole or in part by persons who are inhabitants of this Territory; annuities, but not including pensions from the United States or any of the States."

• Under this section two propositions are presented. It is agreed that there are a large number of mining corporations in Montana whose entire capital stock is invested in assessable property, and that part of said property consists in mining claims. But this concession does not disturb the limitation of section 5219. The restriction therein imposed is equality of assessment with other moneyed capital; not with other property generally, but with that property which passes under the description of moneyed capital. The significance of this expression has been defined by this court in the case of *Mercantile Bank* v. *New York*, 121 U. S. 138, cited in *Palmer* v. *McMahon*, 133 U. S. 660, 667, as follows: "The term 'moneyed capital,' as used in Rev. Stat. § 5219, respecting State taxation of shares in national banks, embraces capital employed in national banks, and capital employed by individuals when

the object of their business is the making of profit by the use
of their moneyed capital as money, — as in banking, as that
business is defined in the opinion of the court."

Obviously by this section, as interpreted by the decisions of
this court, the limitation applies solely to a parallel with the
individual or corporation whose capital in money is used with
a view of compensation for the use of the money. And that
is the only restriction which, under the agreed statement of
facts, demands any consideration. The tax upon a corpora-
tion whose capital is invested in manufacturing or transporta-
tion cannot, under this section, be placed in comparison with
the tax upon an institution whose business is profit on money
as money. So, whatever may be the rule in Montana in
respect to the taxation of mines and mining claims, or of cor-
porations whose investments are wholly or partially in that
direction, it does not challenge or disturb the rule of taxation
of money as money, or of purely moneyed corporations, upon
that basis. Under the general territorial system, as expressed
in the various organic acts, the power of taxation is absolute,
save as restricted by the Constitution or congressional enact-
ments. The intention of Congress in the national banking
system is, as we have noticed, in favor of local taxation, in-
cluding therein territorial taxation of national banks upon
the same basis as is imposed by the locality on other purely
moneyed corporations and capital. That intention is not dis-
turbed by the provisions of the Montana statute, and hence
the rule of taxation in this respect cannot be ignored.

No other questions being presented, we see no error in the
ruling of the Supreme Court of the Territory of Montana,
and its decision is, therefore,

*Affirmed.*