[No. 760.  Decided March 8, 1893.]

FIRST NATIONAL BANK OF ABERDEEN, *Appellant*, v. THE COUNTY OF CHEHALIS, AND J. M. CARTER, *Treasurer*, *Respondents*.

TAXATION — NATIONAL BANK SHARES — INJUNCTION.

The assessment of the capital stock of a national bank, made to the bank *in solido*, is valid.

The collection of the tax assessed upon the capital stock of a national bank will not be enjoined on the ground that the moneyed capital of such institutions is unjustly discriminated against, when the complaint does not show that, either by reason of the law or through the action of the assessors, some considerable moneyed capital, which is employed by individuals in the business of making profit by the use of their moneyed capital as money, is permitted to escape taxation.  The non-taxation of "credits" is not ground for such injunction.

*Appeal from Superior Court, Chehalis County.*

*Preston, Carr & Preston, James B. Howe*, and *M. J. Cochran*, for appellant.

*James A. Haight*, for respondents.

The opinion of the court was delivered by

STILES, J.— The appellant bank complains that the county treasurer of Chehalis county is about to levy upon the property of the bank for taxes for the year 1891, which were assessed to the bank upon its capital stock in the sum of $50,000.  The complaint shows that, although its cashier delivered to the county assessor a list of its stockholders, giving their residence, together with a statement of the amount of the capital stock of the bank held by each of its stockholders on the 1st day of April, 1891, the assessor refused to assess the stock to the holders thereof, and assessed the whole of it to the corporation *in solido*. The tax was levied under the revenue act of 1891, and the

first point made by appellant is, that an assessment of the capital stock of a national bank, made to the bank *in solido*, is forbidden by the provisions of Rev. St. U. S., § 5219.    It seems to us, however, that this contention must be resolved against the appellant, upon the authority of *National Bank v. Commonwealth*, 9 Wall. 353.   Sec. 5219, Rev. St. U. S., is as follows:

"Nothing herein shall prevent all the shares in any association from being included in the valuation of the personal property of the owner or holder of such shares, in assessing taxes imposed by authority of the state within which the association is located; but the legislature of each state may determine and direct the manner and place of taxing all the shares of national banking associations located within the state, subject only to the two restrictions, that the taxation shall not be at a greater rate than is assessed upon other moneyed capital in the hands of individual citizens of such state, and that the shares of any national banking association owned by non-residents of any state shall be taxed in the city or town where the bank is located, and not elsewhere.    Nothing herein shall be construed to exempt the real property of associations from either state, county or municipal taxes to the same extent, according to its value, as other real property is taxed."

This section, so far as the point in issue goes, is, in substance, the same as the forty-first section of the act of congress establishing national banks.   (13 St. at Large, 111). In the case cited, the State of Kentucky, many years before national banks were thought of, had the following provisions among its laws: *First*, That on bank stock or stock in any moneyed corporation of loan or discount there should be paid an annual tax of 50 cents on each share thereof equal to $100, or on each $100 of stock therein owned by individuals, corporations or societies.    *Second*, The cashier of a bank and the treasurer of any other institution whose stock was taxed, should, on the 1st day of July in each year, pay into the treasury the amount of tax due.    If such tax

were not paid, the cashier and his sureties should be liable for the same and 20 per cent. upon the amount, and the said bank or corporation should thereby forfeit the privileges of its charter. 2 Rev. St. Ky., 1860, pp. 239, 266. Under these provisions it was held, in the case above cited, that the bank was subject to an action for the amount of the tax assessed upon the stock, the theory being that the state had the right to resort to the bank as a garnishee for the collection of its claims against the stockholders for taxes which it might otherwise be unable to collect by any means within its power. That case is unreversed, and must be taken to be conclusive authority upon the argument of the question before us. *First National Bank v. Fisher*, 45 Kan. 726 (26 Pac. Rep. 482), and *Miller v. First National Bank*, 46 Ohio St. 424 (21 N. E. Rep. 860), are late cases, where, from a superficial reading of the opinions, it might be gathered that a different holding had been adopted in the supreme courts of Kansas and Ohio, but a closer reading shows that in both of those states the statute expressly provides for the assessment of the shares of stock to the owner, and contains no provision regarding payment of the tax by the bank itself. Secs. 21 and 23 of our revenue law of 1891 contain substantially the same provisions as the Kentucky statute above quoted, in so far as the assessment and collection are concerned (*Paul v. McGraw*, 3 Wash. 296, 28 Pac. Rep. 532), and upon the first point, therefore, the decision must be against the appellant.

The further, and perhaps the principal, ground of appellant's action is found in the following paragraphs of its complaint:

"13. That on the 1st day of April, 1891, there existed in the county of Chehalis, State of Washington, taxable moneyed capital (other than and beyond that invested in shares of stock of national banks and banking business)

owned by citizens of said state, resident in said county, and there invested in loans and securities, to them payable and owing by other citizens of said state residing in said county, of vast amount, to wit, exceeding the sum of two hundred and thirty-seven thousand four hundred dollars.

"14. That on said 1st day of April, 1891, there existed in the State of Washington, in counties other than the county of Chehalis, aforesaid, other taxable capital in money and moneyed capital (aside from the moneyed capital referred to in the paragraph immediately preceding, and aside from the capital invested in banks and banking business), owned by citizens of the State of Washington, resident in said state (in counties other than the county of Chehalis), and there invested in loans and securities to them payable and owing by other resident citizens of said state, in counties other than the county of Chehalis, of vast amount, to wit, exceeding the sum, as complainant is informed and believes, of fourteen million dollars.

"15. That on the said 1st day of April, 1891, the total capitalization of national banks located in the State of Washington was the sum of seven million dollars; that the total capitalization of banks there located, but incorporated under the laws of the State of Washington, was the sum of four million dollars; and that at the same time large amounts of moneyed capital were invested in the State of Washington by residents of said state, in the stocks and bonds of insurance, wharf and gas companies; and, in addition to the foregoing, there then existed in said state other moneyed capital amounting to at least twenty-six million dollars, being the other moneyed capital hereinbefore referred to; that in no case, as complainant is informed and believes, and so charges the fact to be, is the stock of any national bank, or the shares of the stock of any national bank located in the State of Washington, valued for assessment for taxation in said state at a less sum or assessed upon a valuation of less than eighty-five per cent. of the par value thereof; and, further, that the total assessment and total valuation in the assessment for taxation, throughout the State of Washington for the year 1891, of and upon the bonds and shares of banks, banking corporations, insurance, gas, wharf and other corporations, was

the sum of eight million two hundred and five thousand five hundred and three dollars.

"16. That the facts alleged in the preceding paragraphs hereof, numbered 13, 14 and 15, were then, and during all of the times intervening between the 1st day of April, 1891, and the time of the return of the several assessment rolls throughout the State of Washington .by the county assessors to the county auditors, well known to the assessor of the county of Chehalis, and all other county assessors throughout the State of Washington, and during all of said times, and until the first day of March, 1892, were well known to the several county and state officers hereinbefore referred to, and also to the boards of equalization and boards of county commissioners and the auditor of each of the counties in said state, and since the 1st day of March, 1892, have been and now are well known to the defendant, the treasurer of Chehalis county.

"17. That on said 1st day of April, 1891, the entire capital, surplus and undivided profits of complainant were invested as follows, to wit, $12,500 in bonds of the United States, and the remainder in loans to residents of the State of Washington, furniture and fixtures.

"18. That all of said other moneyed capital referred to in the foregoing paragraphs hereof, numbered 13 and 14, was purposely omitted from the assessment and from taxation whatsoever by each and every of the county assessors and other taxing officers throughout the State of Washington, and the same and the whole thereof has escaped taxation throughout the state of Washington.

"19. That the omission by the several county assessors and taxing officers of the several counties in said state to either assess or tax other moneyed property or capital last aforesaid, was made through, under and by reason and in pursuance of an agreement entered into prior to the 1st day of April, 1891, between the several county assessors of the several counties in said state, whereby it was agreed upon between them that such omission should be made by them and all of them; and said omission and agreement to omit was in pursuance of an opinion rendered by the attorney general of the State of Washington to the said several county assessors at their request, advising such omission,

the said attorney general being, by virtue of his office, required by the laws of the State of Washington to render such opinion upon the request of said assessors.

"20. That such omission necessarily operated as a discrimination in favor of other moneyed capital in the hands of individual citizens of said state, and against shares of stock of national banking corporations located within this state, including complainant, and necessarily resulted in the taxation of the shares of such national banks, including complainant, at a greater rate than other moneyed capital in the hands of the individual citizens of the said state, all of which was well known to and most wrongfully intended by said several county assessors and taxing officers, and all of which is in direct violation of and forbidden by the provisions of the Revised Statutes hereinabove specifically referred to."

The substance of these allegations is: *First*, That there was taxable moneyed capital in Chehalis county, which escaped the assessment, amounting to $237,400; *second*, that there was like unassessed moneyed capital in other portions of the state exceeding $14,000,000; *third*, that the moneyed capital invested in banks, national and state, was $11,000,000; *fourth*, that there was invested in the stocks and bonds of insurance, wharf and gas companies, and other moneyed institutions, moneyed capital amounting to at least $26,000,000.

Standing by themselves, the allegations of paragraphs 13, 14 and 15 are not sufficiently definite to enable us to ascertain therefrom the character of the institutions in which the moneyed capital which is said to be unassessed, so that we might say from a reading of the allegations there contained that this, that or the other moneyed capital therein described was or was not assessable, or, if not assessed, that the failure to assess was a discrimination against the national banks; but it is said in the following sections that the facts stated were well known to the county assessors of the several counties in the state, and that their

failure to either assess or tax the omitted moneyed property or capital was the purposed action of the assessors, brought about by an agreement made between the several county assessors in the state, whereby it was agreed between them that such omission should be made by them, and all of them, and that their agreement was caused by an opinion rendered by the attorney general of the state, advising such omission. It might be expected, therefore, that a reference to the published opinions of the attorney general would afford some description of the property by him advised to be omitted from the assessment rolls. While it is outside of the record in this case, it is altogether probable that the opinion of the attorney general of February 5, 1891, addressed to Hon. T. M. Reed, state auditor (Op. Atty. Gen. 1891, p. 59), contains the advice referred to. The question answered by the attorney general was, ''Are credits or mortgages taxable under the law of March 9, 1891?'' and the answer is in the negative. Mortgages are easily enough understood, but when the term ''credits'' is used a much larger class of property is meant. In this opinion, however, the writer evidently refers to mere debts due from one person to another, and the example which he gives and refers to most frequently is a promissory note secured by a real or chattel mortgage, or solvent signers, and there was no reference to the credits of banks, bankers, brokers or stock jobbers, or bonds or stock other than bank stock, or shares of bank stock, or shares of banking, wharfage, gas, water or insurance companies. Accounts, promissory notes and mortgages constitute the subject matter of the opinion. If, therefore, the action of the assessors was based upon this decision of the law officer of the state, and went no further, the allegations of the complaint would certainly turn out to be unsupported.

The requirement of the federal statute that the taxation of national banks was not to be at a greater rate than is as-

sessed to other moneyed capital in the hands of individual citizens of such state, has received frequent attention by the supreme court of the United States, and its construction seems to be at last reasonably settled.    The paramount question has been, what is moneyed capital, within the meaning of the statute?    Every person who uses money in the prosecution of any business must necessarily be said to have a moneyed capital.    But it is not every such capital that is within the terms of this statute.    The purpose of congress in making the provision referred to, as defined by the supreme court of the United States, was merely that the moneyed capital invested in national banks should not be placed at a disadvantage as compared with moneyed capital in the hands of individual citizens of the state, and which is used for practically an identical purpose with that invested in the shares of national banks.

The latest case, in which the subject in discussion was treated with great elaboration, is that of *Mercantile Bank v. City of New York*, 121 U. S. 138 (7 Sup. Ct. Rep. 826), and from that case we quote the following as showing the view taken by the federal court as to what is to be understood by the term "other moneyed capital."    The court said:

"The main purpose of congress in fixing limits to state taxation on investments in the shares of national banks, was to render it impossible for the state, in levying such a tax, to create and foster an unequal and unfriendly competition, by favoring institutions or individuals carrying on a similar business and operations and investments of a like character.    The language of the act of congress is to be read in the light of this policy.    Applying this rule of construction, we are led, in the first place, to consider the meaning of the words 'other moneyed capital,' as used in the statute.    Of course it includes shares in national banks; the use of the word 'other' requires that.    If bank shares were not moneyed capital, the word 'other' in this connection would be without significance.    But 'moneyed capi-

tal' does not mean all capital the value of which is measured in terms of money. In this sense, all kinds of real and personal property would be embraced by it, for they all have an estimated value as the subjects of sale. Neither does it necessarily include all forms of investment in which the interest of the owner is expressed in money. Shares of stock in railroad companies, mining companies, manufacturing companies, and other corporations, are represented by certificates showing that the owner is entitled to an interest, expressed in money value, in the entire capital and property of the corporation, but the property of the corporation which constitutes its invested capital may consist mainly of real and personal property, which, in the hands of individuals, no one would think of calling moneyed capital, and its business may not consist in any kind of dealing in money or commercial representatives of money. So far as the policy of the government in reference to national banks is concerned, it is indifferent how the states may choose to tax such corporations as those just mentioned, or the interest of individuals in them, or whether they should be taxed at all. Whether property interests in railroads, in manufacturing enterprises, in mining investments, and others of that description, are taxed or exempt from taxation, in the contemplation of the law, would have no effect upon the success of national banks. There is no reason, therefore, to suppose that congress intended, in respect to these matters, to interfere with the power and policy of the states. The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations. These are the operations in which the capital invested in national banks is employed, and it is the nature of that employment which constitutes it in the eye of this statute 'moneyed capital.' Corporations and individuals carrying on these operations do come into competition with the business of national

banks, and capital in the hands of individuals thus employed is what is intended to be described by the act of congress.  That the words of the law must be so limited appears from another consideration: they do not embrace any moneyed capital in the sense just defined, except that in the hands of individual citizens.  This excludes moneyed capital in the hands of corporations, although the business of some corporations may be such as to make the shares therein belonging to individuals moneyed capital in their hands, as in the case of banks.  A railroad company, a mining company, an insurance company, or any other corporation of that description, may have a large part of its capital invested in securities payable in money, and so may be the owners of moneyed capital; but, as we have already seen, the shares of stock in such companies held by individuals are not moneyed capital.  The terms of the act of congress, therefore, include shares of stock or other interests owned by individuals in all enterprises in which the capital employed in carrying on its business is money, where the object of the business is the making of profit by its use as money.  The moneyed capital thus employed is invested for that purpose in securities by way of loan, discount, or otherwise, which are from time to time, according to the rules of the business, reduced again to money and reinvested.  It includes money in the hands of individuals employed in a similar way, invested in loans, or in securities for the payment of money, either as an investment of a permanent character, or temporarily with a view to sale or repayment and reinvestment.  In this way the moneyed capital in the hands of individuals is distinguished from what is known generally as personal property. . . . This definition of moneyed capital in the hands of individuals seems to us to be the idea of the law, and ample enough to embrace and secure its whole purpose and policy.''

In *Palmer v. McMahon*, 133 U. S. 660 (10 Sup. Ct. Rep. 324), the court said:

"We have also held that . . . because a state statute does not provide for the taxation of shares in corporations other than banks, it does not follow that the tax on moneyed capital invested in bank shares is at a greater rate

than that of the moneyed capital of individual citizens invested in other corporations, nor are the shareholders in national banks discriminated against because the taxation of such other corporations is arrived at under a separate system;'' citing *Mercantile Bank v. City of New York*, *supra*.

And in *Talbott v. Silver Bow Co.*, 139 U. S. 438 (11 Sup. Ct. Rep. 594), where the question was whether, because the capital stock of certain mining and other corporations in the Territory of Montana were not taxed, the shares of a national bank could be assessed to the owner thereof, the court quoted from its opinion in *Mercantile Bank v. City of New York*, as follows:

''The term 'moneyed capital,' as used in the Rev. Stat., § 5219, respecting state taxation of shares in national banks, embraces capital employed in national banks, and capital employed by individuals when the object of their business is the making of profit by the use of their moneyed capital as money — as in banking, as that business is defined in the opinion of the court.''

The allegations of this complaint nowhere show that any moneyed capital of the character defined by the federal supreme court was omitted or intended to be omitted by the assessors; or, if the intention of the complaint be to recover any such existing cases, the allegations are so general and indefinite that they could not be made the basis of individual action.   In order to make out a case for the interference of the courts it must appear that, either by reason of the law or through the action of the assessors, some considerable moneyed capital, which is employed by individuals in the business of making profit by the use of their moneyed capital as money, is permitted to escape taxation. The non-taxation of what are termed '' credits,'' in the opinion of the attorney general alluded to, would not suffice.

Judgment affirmed.

DUNBAR, C. J., and HOYT, ANDERS and SCOTT, JJ., concur.