FEDERAL LAND BANK OF BALTIMORE, Petitioner, v. DISTRICT COURT OF AGUADILLA, Respondent.

No. 891. Argued April 6, 1933.—Decided June 5, 1933.

Arturo Reichard, Frank Martínez, S. García Díaz, and E. Campos del Toro for petitioner. Harry Besosa, U. S. District Attorney, for the United States. J. Fernández Diez for the Puerto Rico Hurricane Relief Commission.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

The Federal Land Bank of Baltimore brought a summary foreclosure proceeding against Julio Acevedo Bosques and

his wife, Josefa Vera, to enforce a credit of $1,000, with interest thereon at the rate of 5½ per cent per annum. As security for this loan, Acevedo and his wife had mortgaged a property belonging to them, which later was encumbered by a second mortgage in favor of the United States of America. The mortgage creditor named the United States as a party defendant in the proceeding, and notified the Attorney General of the United States and the United States Attorney for the District of Puerto Rico, who appeared in the lower court and objected to the proceeding on the ground that the court lacked jurisdiction in respect to the United States and the credit it owned. The lower court declared the proceeding void as to the United States, and stated that neither the Mortgage Law nor its Regulations authorize the bringing as a party defendant, in a proceeding for the enforcement of a mortgage credit, a person holding a lien which has been recorded subsequently to the right of the petitioner; and, further, that the act entitled ''An Act to permit the United States to be made a party defendant in certain cases'' has no application to the case at bar. The lower court stayed the proceeding in relation to the credit of the petitioner, and declared itself without jurisdiction with respect to said petitioner and his credit. In view of this decision, The Federal Land Bank applied to this Court for a writ of certiorari to review the proceedings of the lower court.

The fundamental question to be decided is whether the Act to permit the United States to be made a party defendant in certain cases, applies in Puerto Rico with the same force and effect as in the continental United States. According to our Mortgage Law, where liens exist which have been recorded subsequently to the right of the foreclosing creditor, notice of the writ demanding payment (*auto de requerimiento*) must be served on all persons interested in said liens. This notice to all the creditors who recorded subsequently to the execution creditor gives them an opportunity to pay the latter's claim, interest thereon, and costs before

the auction sale, and to intervene in the assessment and public sale of the property if they so desire. After this notification has been made the procedure by compulsory process must follow its regular course, without any further notification to the creditors. 4 Morell 58; 3 Barrachina 163. The Mortgage Law does not require that the subsequent creditors be made parties defendant. It is sufficient to comply with the requirement as to service of notice.

In the continental United States the subsequent creditor is not, generally, a necessary party in order that the court may render a binding and final judgment as to the parties to the proceedings. But if such subsequent creditor has not been joined as a party defendant, the judgment does not preclude him from exercising in the future any right of redemption to which he may be entitled. This right of redemption originated in the equity courts. It arose out of necessity, to soften the rigor of the common law, which permitted the title to the property to pass from the debtor to the mortgage creditor and vested an absolute estate in the latter upon failure of the former to comply with the conditions of the contract. It is in order to cut-off this right of redemption, known as ''equity of redemption,'' that the mortgage creditor resorts to a foreclosure proceeding against the mortgage debtor and any other party having a right to redeem. To mitigate the severity of the common law, the English courts made use of the Roman law, in which the principles of equity that protect the rights of the mortgage debtor originated. Acknowledging this contribution of the civil law, the Supreme Court of Illinois, in the case of _Longwith et al._ v. _Butler,_ 8 Ill. 37, said:

''Equity has, however, obtained jurisdiction over the subject of mortgages, and has, in a spirit of humanity and justice, essentially modified the common law principles, and, as some eminent writers have said, has achieved a noble triumph over technical rules. 4 Kent, 158; 2 Story, sec. 1014. It will be conceded by all, who have any knowledge of the Roman law, that the equitable doctrines now

universally prevailing in regard to mortgages, have been derived from that source. The civil law, in this as in many other instances, has been the great armory from which the courts of equity in England have supplied themselves with the most efficient weapons to ward off the severities of the stern and unrelenting common law.

"   *        *        *        *        *        *        *

"Default of payment at the stipulated time worked no forfeiture of the mortgage or pledge by the civil law; but the creditor obtained a right to reimburse himself by sale, and ordinarily he might sell without any judicial sanction, after giving proper notice to the debtor of his intention, whether the authority to sell were expressly given to him or not. 2 Story's Eq., sec. 1009, and the numerous authorities there cited. In fact, courts were generally applied to in such cases only where the sale of the mortgaged estate or personal property could not be effected, for the purpose of obtaining a decretal order to vest the property absolutely in the mortgagee. 2 Story's Eq., sec. 1024."

In our law, the mortgage debtor as well as the subsequent creditors have an opportunity to pay the amount claimed up to the time a judicial sale of the mortgaged property takes place. There exist for the debtor and for the subsequent creditor practically the same guaranties as are recognized by the principles of equity. In the instant case, the United States is a second mortgage creditor. The Federal Bank resorted to a summary foreclosure proceeding in order to satisfy its credit. After the formal demand for payment was served upon the debtor and the subsequent creditors were notified, the court acquired jurisdiction to cancel all the subsequent liens after the judicial sale, without the necessity of any further proceedings. This has been the invariable procedure since the establishment of the mortgage system in this jurisdiction. In the present case, however, it is sought to name the United States as a party defendant, because in no other way could the lien constituted in its favor be disposed of, since we are dealing with a sovereign power. Because of the immunity a sovereign enjoys, whether it be the United States, a State, or a Territory, it has been

impossible in the past to cancel liens constituted in its favor without joining it as a party defendant, and to do so it was necessary to obtain its consent. The mortgage creditor could freely sue and obtain the sale of the mortgage realty; but the lien of the State remained the same as before the suit was brought. *Christian* v. *Atlantic & N. C. Railroad*, 133 U. S. 243. In order to obviate this difficulty, the Act that permits the United States to be made a party defendant under certain conditions was passed. We transcribe below the reasons given by the Committee on the Judiciary of the House of Representatives of the United States for favorably recommending that legislative measure:

"This legislation has been recommended for a number of years by the American Bar Association through its committee on removal of Government liens on real estate, the United States League of Local Building and Loan Association, and by numerous land title companies, in order to relieve against the injustice with which mortgagees are confronted under the present state of the law who find, when it is necessary to foreclose their mortgages, that there have been filed against the property a junior lien by the Federal Government for some debt due the United States by the owner of the equity in the property; and for which the mortgagee owes no obligation either legal or moral. In such circumstances the mortgagee finds himself at an impasse. It is impossible for him to bring about a judicial sale of the property owing to the cloud upon the title created by the Government's lien. He can not remove the lien as there is no method by which he may bring the United States in as one of the parties to the foreclosure proceeding. He is, therefore, in effect defeated of his own right to foreclose unless he is willing to pay off the Government lien, a debt for which he is in no way responsible and he being a person to whom the Government would in no event look for its payment."

This legislation was the object of prolonged discussions in the conferences held by the committees of both Houses. Said discussions culminated in the approval of a substitute bill which was later enacted into law without any amendments. The House Committee presented a report stating the agreement arrived at in the conferences. We copy what

the report sets forth concerning section 4 of the act, as the same was finally passed:

"The senate amendment contains a clause allowing the court to stay proceedings on sale until the expiration of the next session of Congress. This was no doubt intended to allow Congress to appropriate money to enable the United States, if a junior lien holder, to bid enough at the sale to take care of the prior liens and thus protect its own. In place of that the substitute bill provides that if a junior lien holder, the United States shall have a year in which to redeem. That does away with any necessity for a delay of sale. In many states of the Union there are now laws allowing a junior lien holder as well as fee owners a year in which to redeem from execution and foreclosure sale of real estate. It is true that in other states no such equity of redemption exists. However, the provision adds nothing to the present difficulties in states which allow no redemption period, as under present conditions where present lien holders cannot sue the United States the rights of the United States never are barred by foreclosure proceedings."

For the sake of clearness and a better understanding, we transcribe sections 1, 3, and 4 of the act in question, thus:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That, upon the conditions herein prescribed for the protection of the United States, the consent of the United States be, and it is hereby given, to be named a party in any suit which is now pending or which may hereafter be brought in any United States district court, including those for the districts of Alaska, Hawaii, and Porto Rico, and the Supreme Court of the District of Columbia, and in any State court having jurisdiction of the subject matter, for the foreclosure of a mortgage or other lien upon real estate, for the purpose of securing an adjudication touching any mortgage or other lien the United States may have or claim on the premises involved.

"  *       *       *       *       *       *       *

"Sec. 3. Any such suit brought against the United States in any State court may be removed by the United States to the United States district court for the district in which the suit may be pending. The removal shall be effected in the manner prescribed by section 29 of the. Judicial Code (title 28, sec. 72, U. S. C.) : *Provided,* That the petition for removal may be filed at any time before the expira-

tion of thirty days after the time herein or by the court allowed to the United States to answer, and no removal bond shall be required. The court to which the cause is removed may, before judgment, remand it to the State court if it shall appear that there is no real dispute respecting the rights of the United States, or all the other parties shall concede of record the claims of the United States.

"Sec. 4. Except as herein otherwise provided, a judicial sale made in pursuance of a judgment in such a suit shall have the same effect respecting the discharge of the property from liens and encumbrances held by the United States as may be provided with respect to such matters by the law of the State, Territory, or District in which the land is situated, provided that a sale to satisfy a lien inferior to one of the United States shall be made subject to and without disturbing the lien of the United States, unless the United States, by its attorneys, consents that the property may be sold free of its mortgage or lien and the proceeds divided as the parties may be entitled: *And provided further,* That where a sale is made to satisfy a lien prior to that of the United States, the United States shall have one year from the date of sale within which to redeem. In any case where the debt owing the United States is due, the United States may ask, by way of affirmative relief, for the foreclosure of its own lien or mortgage and in any case where property is sold to satisfy a first mortgage or first lien held by the United States, the United States may bid at the sale such sum not exceeding the amount of its claim with expenses of sale, as may be directed by the chief of the department, bureau or other agency of the Government which has charge of the administration of the laws in respect of which the claim of the United States arises."

It is unnecessary to consider the legal aspect of this question in Puerto Rico before said legislation was enacted. We have already noted the reasons advanced by the Judiciary Committee in favor of this legislation. The United States consents to be sued in any of its district courts, including Hawaii, Alaska, and Puerto Rico. This consent to be sued in our Island, as well as the provisions of section 4 of the act, clearly expresses, beyond all doubt, the intention of Congress to extend to Puerto Rico the said legislation. It is urged, however, that the United States has consented to be sued only in the Federal district court, to the exclusion of

the insular courts. To accept this interpretation would be equivalent to declaring that this act, which is in force in Puerto Rico by the authority of the Congress, is rendered practically inapplicable by a mandate of the Congress itself. It can not be conceived that Congress would extend to Puerto Rico the said legislation without affording the means to make it effective. The Federal Bank can not sue the debtor Julio Acevedo Bosques in the United States District Court, because this court lacks jurisdiction over the parties and over the amount in controversy, which does not exceed $3,000. It must necessarily resort to an insular court, whose judgments do not bind the United States unless the latter appears, with its consent, as a party defendant. The said act, according to the report of the Judicial Committee, was passed in order to relieve against an injustice. It can not be presumed that Congress intended to apply the remedy without restriction in the continent, and with marked limitations in this jurisdiction. If there is any reason serving as a basis for a restricted interpretation, we must confess that such a reason escapes our understanding. The United States would gain nothing by our interpreting the act in a restrictive sense and holding that it can not be named a party defendant in an insular court. On the other hand, if the contrary is held, and a reasonable interpretation is adopted which facilitates the application of the law and the accomplishment of the purpose for which it was enacted, the United States may be benefited due to the provisions prescribed in the act for its protection, and at the same time the benefit will be obtained of a judicial determination of the lien constituted in its favor as a subsequent mortgage creditor.

It is advisable to state that the United States does not need to submit itself to the insular courts if it chooses not to do so. The act saves to it the right to remove the cause to its own courts after the complaint has been filed in the local court. There is no fear, therefore, that its rights might be determined in a court which might be objectionable to it.

If the purpose sought by Congress was to correct an injustice, such an injustice might occur as easily among us as on the continent. If the act is in force in Puerto Rico, the means to make it effective should also be available, and we think that if the insular courts are to be disregarded, it may not always be possible to secure its effectiveness.

The petitioner maintains that the phrase "State court" includes the insular courts. The United States has consented to be named a party defendant in any United States district court, including those for Alaska, Hawaii, and Puerto Rico, and the Supreme Court of the District of Columbia, and any State court having jurisdiction of the subject matter. The petitioner urges that when Congress used the expression, "State court having jurisdiction of the subject matter," it intended to refer to the courts other than the Federal courts in the regions mentioned in section 1 of the act. It is not reasonable to suppose that Congress, after referring to the Federal courts, including those for Puerto Rico, Hawaii, and Alaska, in mentioning immediately thereafter the State courts with jurisdiction of the subject matter, intended to refer only to the courts of the States of the American Union, excluding the local courts of Puerto Rico, Hawaii, and Alaska.

The word "state" may refer to a State of the Union within the Constitution and to a political community duly organized—not necessarily as a State, Territory, or District—under the Government of the United States.

Let us see what the Supreme Court of the United States says concerning this interesting question. From the opinion delivered in the case of *Talbott* v. *Silver Bow County,* 139 U. S. 438, 444–445, we transcribe the following:

"In this section no express reference is made to Territories; States only are mentioned. Tested by the letter, the argument is short and clear. Congressional permission is essential; no permission is given to the Territories; therefore, Territorial taxation is unauthorized and void. Whatever may be the voice of the letter, the argument

fails because the minor premise cannot be sustained. Can it be that Congress meant to give power to the States to tax, and to withhold that power from the Territories? Some plausible reason should be suggested before the intention is imputed to Congress of granting to an independent jurisdiction, such as a State, the power to tax one of its own instrumentalities, and at the same time withholding a like power from a political organization like that of a Territory wholly dependent upon Congress, and subject to its absolute supervision and control. Such is not the ordinary lesson of experience. . . . .

"Still further, while the word State is often used in contradistinction to Territory, yet in its general public sense, and as sometimes used in the statutes and the proceedings of the government, it has the larger meaning of any separate political community, including therein the District of Columbia and the Territories, as well as those political communities known as States of the Union. Such a use of the word State has been recognized in the decisions of this court. Thus, in the early case of *Hepburn* v. *Ellzey*, 2 Cranch, 445, 452, Chief Justice Marshall observed: 'On the part of the plaintiffs it has been urged that [the District of] Columbia is a distinct political society; and is, therefore, "a State," according to the definitions of writers on general law. This is true.' In *Metropolitan Railroad* v. *District of Columbia*, 132 U. S. 1, 9, Mr. Justice Bradley, speaking for the court, declared that 'it is undoubtedly true that the District of Columbia is a separate political community in a certain sense, and in that sense may be called a State.' And in the case of *Geofroy* v. *Riggs*, 133 U. S. 258, 268, a similar construction was given to the use of the word 'State,' and in a clause which seemed on the face to carry a narrower meaning than the language used in section 5219, *supra*. The clause was found in a treaty between France and the United States, and that clause was as follows: 'In all the States of the Union, whose existing laws permit it, so long and to the same extent as the said laws shall remain in force, Frenchmen shall enjoy the right of possessing personal and real property by the same title and in the same manner as the citizens of the United States.' On the face of the language, the word 'State' would seem to refer, not to political communities in general, but to those particular communities which form the States of the Union; yet it was held to include the District of Columbia, this court, by Mr. Justice Field, observing; 'This article is not happily drawn. It leaves in doubt what is meant by 'States of the Union.' Ordinarily these terms would be held to apply to those

political communities exercising various attributes of sovereignty which compose the United States, as distinguished from the organized municipalities known as Territories and the District of Columbia. And yet separate communities, with an independent local government, are often described as States, though the extent of their political sovereignty be limited by relations to a more general government or to other countries. Halleck on Int. Law, c. 3, Secs. 5, 6, 7. The term is used in general jurisprudence and by writers on public law as denoting organized political societies with an established government. Within this definition the District of Columbia, under the government of the United States, is as much a State as any of those political communities which compose the United States.' ''

Paraphrasing the language of the Supreme Court of the United States, we may well ask, as the petitioner suggests, can it be that Congress meant to correct this injustice in the States, and to withhold that remedy from the Territories? Some plausible reason should be suggested before that intention is imputed to Congress. Such is not the ordinary lesson of experience.

By no stretch of the imagination would it be possible to find a reason, and much less a plausible reason, to justify the exclusion of the insular or Territorial courts. The United States consents to be named a party in any proceeding, pending or which may be brought in the future, in any United States district court, including that for the district of Puerto Rico, and in any State court having jurisdiction of the subject matter. Puerto Rico is a sovereign political entity. It has its Governor, a Legislature, a Judicial Power, and generally all the attributes of a separate political organization. It has been declared an organized territory, and is a State of the American Union in the broad sense of the term, which in our opinion is the sense in which Congress used the word ''State'' when it referred to the State courts having jurisdiction of the subject matter.

However, the fact that the United States consents to be sued does not mean that it is obligatory to name it as a party in an action filed to enforce a mortgage credit. The United States is not a necessary party to the proceeding

brought against the debtor. The creditor may name it as a party defendant or may disregard its intervention. If he chooses to sue it jointly with the debtor, under the Federal statute, then it must be understood that the foreclosing creditor elects to enforce his credit by an ordinary action since the Act of Congress allows the United States sixty days within which to appear and answer, plead, or demur.

We hold that the district courts should comply with the provisions of the said Act of Congress, by making the United States a party defendant whenever the mortgage creditor invokes that act.

The order of the District Court of Aguadilla of January 27, 1933, should be annulled, and the case remanded to said court for further proceedings not inconsistent with this opinion.

Mr. Justice Wolf and Mr. Justice Aldrey dissented.