## INTER-ISLAND STEAM NAVIGATION CO. *v.* TERRITORY OF HAWAII.

No. 94. Argued November 18, 1938.—Decided December 5, 1938.

*Mr. J. Garner Anthony* for petitioner.

*Mr. Julius Russell Cades,* with whom *Mr. Urban Earl Wild* was on the brief, for respondent.

308

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioner, a Hawaiian corporation, is a common carrier of freight and passengers by water between different points in the Territory. A substantial part of its gross income is derived from transporting freight destined for trans-shipment to foreign or mainland ports. In 1913 a statute of the Territory created a Public Utilities Commission, prescribed its duties and levied a uniform semiannual tax—denominated a fee [1]—upon all public utilities doing business in the Territory, partially to defray the Commission's expenses. Petitioner paid the tax until 1923, when it refused to make further payments, contending the tax could not validly be applied to it. In this suit, the Territory recovered judgment in the territorial court for the taxes assessed for the years 1923 to 1930, inclusive. The Supreme Court of Hawaii and the Circuit Court of Appeals both affirmed.[2]

The Hawaiian "Utilities Act of 1913," [3] under which the challenged taxes have been levied, invested the territorial Commission with broad powers to investigate all public utilities doing business in the Territory, with reference to the safety and accommodation of the public; safety, working hours and wages of employees; rates and fares; valuation; issuance of securities; amount and disposition of·

---

[1] Cf., *New York* v. *Latrobe*, 279 U. S. 421, 423.

[2] 33 Haw. 890; 96 F. 2d 412.

[3] Act 89 S. L. Haw. 1913, as amended by Act 127, S. L. Haw. 1913, c. 132, of the Revised Laws Hawaii, 1925, c. 261, Revised Laws Hawaii, 1935.

income; business relations with others; compliance with territorial and federal laws and provisions of franchises, charters, and articles of association; regulations, practices and service; accidents, in connection with utility operations, believed by the Commission to require investigation and "all matters of every nature affecting the relations and transactions between . . . [such utilities] and the public, or persons, or corporations."

This territorial Commission was empowered to make its investigations "notwithstanding that the same may be within the jurisdiction of the Interstate Commerce Commission, or within the jurisdiction of any court or other body, and when after such examination the [territorial] commission shall be of the opinion that the circumstances warrant, it shall be its duty to effect the necessary relief or remedy by the institution and prosecution of appropriate proceedings or otherwise before the Interstate Commerce Commission, or such court, or other body, in its own name or the name of the Territory, . . ."

The taxes in question accrued under § 17 of the Act of 1913, providing that "There shall . . . be paid to the commission in each of the months of March and September in each year by each public utility which is subject to investigation by the commission a fee which will be equal to one-twentieth of one per centum of the gross income from the public utility business carried on by such public utility in the Territory during the preceding year, plus one-fiftieth of one per centum of the par value of the stock issued by such public utility and outstanding on December 31 of the preceding year, . . ." After collection, the taxes "shall be deposited in the treasury of the Territory to the credit of a special fund to be called the 'Public Utilities Commission Fund'" to be used—with any appropriations made available by the territorial legislature—to pay necessary expenses of the Commission in the performance of its duties under the Act.

The Organic Act granting legislative power to the territorial government of Hawaii provides that "the legislature shall not grant to any corporation, association, or individual any special or exclusive privilege, immunity, or franchise without the approval of Congress; . . ." [4] Pursuant to the Organic Act, and prior to the effective date of the Utilities Act of 1913, the territorial legislature passed Act 135 S. L. Haw. 1913—to take effect upon the approval by Congress—providing that all public utilities previously granted franchises should "be subject as to reasonableness of rates, prices, and charges and in all other respects to the provisions of . . . [the Utilities Act of 1913] and all amendments thereof for the regulation of public utilities in said Territory; . . . " March 28, 1916,[5] Congress expressly ratified, approved and confirmed this Hawaiian Act 135.

Act 135 as enacted by the Territory applied only to Hawaiian utilities specially described in the Act. However, Congress in ratifying and approving, broadened the Act by amendment so as to include not only the described utilities but "all public utilities and public-utilities companies organized or operating within the Territory of Hawaii." By further amendment Congress provided that nothing in Act 135 should "limit the jurisdiction or powers of the Interstate Commerce Commission" and that all actions of the Hawaiian Public Utility Commission should "be subject to review by the courts of the . . . Territory."

September 7, 1916, Congress enacted the "Shipping Act of 1916." [6] For the purposes of the Shipping Act, "The term 'common carrier by water in interstate commerce' " was given a statutory definition to include

---

[4] Act of Cong., April 30, 1900, c. 339, § 55, 31 Stat. 150; U. S. C., Title 48, § 562.

[5] 39 Stat. 38, c. 53.

[6] 39 Stat. 728, c. 451, Act of September 7, 1916.

"a common carrier . . . by water of passengers or property . . . on regular routes from port to port between . . ." places in the same "Territory, District or possession." This Act created the United States Shipping Board, with broad powers to investigate and supervise carriers by water in foreign and interstate commerce as defined therein.

We accept the conclusion of the Supreme Court of Hawaii that petitioner is a public utility as defined by the Hawaiian Act.[7] However, petitioner contends that the Territory cannot validly apply this tax to it. We have examined all of the grounds upon which this contention rests. None is sufficient to remove petitioner from the operation of the Utilities Act of 1913 as applied here.

*First.* Petitioner contends that the passage of the Shipping Act by Congress completely ousted the territorial Commission of all jurisdiction over it in any respect, or for any purpose, and thus withdrew the Commission's power to collect the fees in question.

The Supreme Court of Hawaii held in this case, as heretofore,[8] that the Shipping Act did deprive the territorial Commission of authority, under the Act of 1913, to regulate by its own order the rates of this petitioner. In the present case, however, that court concluded that the Shipping Act did not withdraw the territorial Commission's power to *investigate* water carriers—such as petitioner—as to rates and other matters, either for the exercise of its own permitted supervisory powers or for presentation of the public's case before appropriate governmental bodies.[9] The territorial Act of 1913—to which Congress

---

[7] Cf., *Waialua Agricultural Co.* v. *Christian, ante,* p. 91.

[8] *Re Inter-Island Steam Navigation Co.,* 24 Haw. 136.

[9] Similarly, many states have authorized utility commissions to make investigations and to institute proceedings before the Interstate Commerce Commission. Ala. Code (Michie), 1928, § 9669; Crawford &

in 1916 subjected all utilities doing business in Hawaii—gave the territorial Commission jurisdiction over many matters other than rate regulation. In general, the Commission was empowered to supervise and regulate local properties and activities of utilities and to protect the public interest in relation to rates, operations, and many other phases of the utility business. While, in some instances, the Commission was powerless to enter any final order, nevertheless its authority to investigate and to appear before appropriate governmental agencies was designed as a part of a general plan to safeguard the public interest. The Shipping Act invested the Shipping Board with authority over some of these matters. But no language in that Act indicates that Congress intended to withdraw all of the territorial Commission's jurisdiction over territorial water carriers. While Congress had complete power to repeal the entire territorial Public Utilities Act, "an intention to supersede the local law [of a Territory] is not to be presumed, unless clearly expressed." [10] Petitioner owns, controls, operates and man-

---

Moses Dig. of Stats. of Ark. 1921, § 1630; Struckmeyer, Revised Code Ariz. 1928, § 691; Gen. Laws of Calif., 1937 (Deering), § 34; Code of Ga., 1933, § 93–314; Code of Iowa, 1931, §§ 7890, 7891; Revised Stat. of Kan. Ann., 1923, § 66–148; Md., 1 Ann. Code—Bagby, p. 835, Art. 23, § 384; 1 Mason's Minn. Stat. (1927), § 4660; Rev. Statutes of Missouri (1929), § 5187; Cons. Laws of N. Y.—Cahill (1930), c. 49, p. 1878; § 59; (North Carolina) Cons. Stat. Ann. (1919), p. 464, § 1075; New Hampshire Public Laws, 1926, Vol. II, p. 923, (22, 23); 2, Olson, Ore. Laws of 1920, p. 2374, § 5872; 66 Purdon's Penna. Stat., § 552; (South Dakota)—Compiled Laws, 1929, Vol. II, p. 3264, § 9577–8; (1935) Wis. Stat., § 195.17.

"In its general scope and purpose, as well as in its terms, [the Shipping Act] . . . closely parallels the Interstate Commerce Act; and we cannot escape the conclusion that Congress intended that the two acts, each in its own field, should have like interpretation, application and effect." *U. S. Navigation Co.* v. *Cunard S. S. Co.*, 284 U. S. 474, 481.

[10] *France* v. *Connor*, 161 U. S. 65, 72; see *Davis* v. *Beason*, 133 U. S. 333, *Cope* v. *Cope*, 137 U. S. 682; cf., *Savage* v. *Jones*, 225 U. S. 501, 533; *Gilvary* v. *Cuyahoga Valley Ry. Co.*, 292 U. S. 57, 60

ages numerous steam vessels, wharfs, docks and real and personal property useful in the transportation of passengers and freight between the various ports and islands of Hawaii. Petitioner's gross income between the years 1922 and 1929 from business transacted in the Territory amounted to approximately $18,000,000. This Territory is located far from the mainland of the United States. Only clear and explicit statutory language could justify a holding that Congress intended by the Shipping Act to deprive the territorial government of *all* jurisdiction over activities such as petitioner's, vitally affecting the trade, commerce, safety and welfare of the people of the Territory.

We agree with the Supreme Court of Hawaii that the Shipping Act of 1916 did not wholly supersede the territorial Act of 1913 as applied to water carriers like petitioner, and did not take from the territorial Commission its power to investigate such utilities. A valid legislative power necessarily includes the right to provide funds to be expended in its exercise.

*Second.* Petitioners contend, however, that the taxes involved constitute a burden on interstate and foreign commerce in violation of the Commerce Clause of the Federal Constitution. But here, Congress, by its Act of 1916, subjected petitioner to the territorial law under which these very taxes were levied.

Under the Constitution, Congress has the power to regulate interstate commerce.[11] Therefore, assuming— but not deciding—that petitioner is engaged in interstate and foreign commerce, Congress has exercised its power in the present case by permitting the Territory to act

[11] For illustrations of the extent of this power, see *Gibbons* v. *Ogden*, 9 Wheat. 1, 196; *In re Rahrer*, 140 U. S. 545; *Second Employers' Liability Cases*, 223 U. S. 1; *Houston, E. & W. T. Ry. Co.* v. *United States (Shreveport Case)*, 234 U. S. 342; *Clark Distilling Co.* v. *Western Maryland Ry. Co.*, 242 U. S. 311; *Alabama & V. Ry. Co.* v. *Jackson & E. Ry. Co.*, 271 U. S. 244, 250.

upon this commerce by the imposition of the contested taxes. The imposition of these taxes under an Act to which Congress expressly subjected petitioner does not violate the Commerce Clause.

Congress had the power to subject petitioner to this tax by virtue of its authority over the Territory, in addition to its power under the Commerce Clause. "Congress may not only abrogate laws of the territorial legislatures, but it may itself legislate directly for the local government. It may make a void act of the territorial legislature valid, and a valid act void. In other words, it has full and complete legislative authority over the people of the Territories and all the departments of the territorial governments." [12]

*Third.* Petitioner contends that the challenged tax is prohibited by the Fifth Amendment because "no investigation, supervision, or regulation of petitioner was in fact made by the Commission."

A general tax designed to effectuate a plan for control and supervision of public utilities need not be apportioned among the taxpayers according to the actual services performed directly for each. Such a requirement would seriously impair the effective application and operation of general tax systems. Services performed by the Hawaiian Public Utilities Commission were for the benefit of the public as a whole and are not any the less services beneficial to petitioner because its business has not been given any special assistance.[13] "A tax is not an assessment of benefits." [14]

The judgment is

*Affirmed.*

---

[12] *Mormon Church* v. *United States*, 136 U. S. 1, 43; cf., *Sere* v. *Pitot*, 6 Cranch 332; *American Ins. Co.* v. *Canter*, 1 Pet. 511; *Door* v. *United States*, 195 U. S. 138; *Cincinnati Soap Co.* v. *United States*, 301 U. S. 308.

[13] Cf. *Clyde Mallory Lines* v. *Alabama*, 296 U. S. 261, 266.

[14] *Carmichael* v. *Southern Coal Co.*, 301 U. S. 495, 522.