# MO HOCK KE LOK PO et al. v. STAINBACK et al.

## Civ. A. No. 765.

District Court, Hawaii.

Oct. 22, 1947.

DENMAN, Circuit Judge, dissenting in part.

Wai Yuen Char, of Honolulu, T. H., and A. L. Wirin, of Los Angeles, Cal., for plaintiffs.

Rhoda V. Lewis, Asst. Atty. Gen., and Thomas W. Flynn, Deputy Atty. Gen., for defendants.

J. Russell Cades and Edward Z. Buck, both of Honolulu, T. H., amici curiae, on question of jurisdiction.

Before DENMAN, Circuit Judge, and McCORMICK and METZGER, District Judges.

DENMAN, Circuit Judge.

Plaintiffs seek a judgment declaring unconstitutional Act 104 of the Hawaiian Legislature enacted on May 1, 1943, entitled "An Act Regulating the Teaching of Foreign Languages to Children," now embodied in Hawaiian Rev. Law, Chapter 31. They also seek to enjoin the defendants Superintendent of Public Instruction, the Governor and the Attorney General from their enforcement of that Act.

Two of the plaintiffs are Wah Chan Thom, a Hawaiian citizen of Chinese ancestry, having three children in the public schools of Hawaii, one 13 years of age and in the seventh grade, one eight years of age and in the third grade, and one three years of age, and Wilfred Chong, of the same citizenship and ancestry, having a child of thirteen in the sixth grade and one of nine in the third grade, and one of five attending kindergarten. They seek to have their children taught the Chinese language without the restrictions imposed by the challenged Act.

The remaining plaintiffs are a teacher of the Chinese language, Leong Nget Cho, a Hawaiian citizen, and the three Hawaiian eleemosynary corporations chartered to teach and seeking to teach the Chinese language.

The evidence adduced establishes that each of the corporation plaintiffs has a matter in controversy exceeding, exclusive of interest and costs, the sum of $3,000 required by 28 U.S.C. § 41(1), 28 U.S.C.A. § 41(1). As to the other plaintiffs the amended complaint has no statement as to the amount in controversy. The court sua sponte notes that the jurisdictional amount of § 41(1) is required of all civil suits litigating constitutional questions except those stated in the succeeding 27 paragraphs. No one of these gives the district courts jurisdiction of a deprivation of a right created by a *territorial* law, though paragraph (14) gives such jurisdiction to such a deprivation by a state law.[1] It thus seems that Congress intends that a territorial invasion of the right in controversy involving less than $3,000 should have its litigation in the territorial courts.

We will therefore be required to dismiss the complaint as to the plaintiffs, the teacher of Chinese and the parents and children, unless within twenty days herefrom the complaint be amended to contain allegations of the required jurisdictional amounts in controversy.

The striking provision of the Act is the extraordinary definition of what constitutes

[1] "(14) Suits to redress deprivation of civil rights. Fourteenth. Of all suits at law or in equity authorized by law to be brought by any person to redress the deprivation, under color of any law, statute, ordinance, regulation, custom, *or usage, of any State,* of any right, privilege, or immunity, secured by the Constitution of the United States, or of any right secured by any law of the United States providing for equal rights of citizens of the United States, or of all persons within the jurisdiction of the United States. (Mar. 3, 1911, c. 231, § 24, par. 14, 36 Stat. 1092.)" (Emphasis supplied.)

Paragraph 1 of Civil Rights Act of April 20, 1871, 17 Stat. 13, in which the right is confined to an invasion by a statute of a *state* only. When codified in 1878 in the Revised Statute § 1979,

the form in which it is now cast in 8 U.S.C. § 43, 8 U.S.C.A. § 43, the right was redefined as including territorial statutes. However, even under the Revised Statutes the *jurisdiction* was specifically restricted to suits on *state* statutes. District Courts, R.S. § 563, par. twelfth; Circuit Courts, § 629, par. sixteenth.

In this respect it also should be noted that the Supreme Court in Douglas v. City of Jeannette, 319 U.S. 157, 161, 63 S.Ct. 877, 87 L.Ed. 1324, involving only a state statute, after stating the $3,000 amount need not be alleged or proved, cites R.S. § 1979, 8 U.S.C. § 43, 8 U.S.C.A. § 43, containing the words "or territory," as if the mere creation of the right conferred the jurisdiction. However, the Court finally places the jurisdiction on Section 41 (14) which does not contain the word territory.

a school in which a foreign language is taught. Section 1872 provides, "Definitions. As used in this chapter: 'School' means any person, firm, group of persons, unincorporated association, corporation, establishment, or institution, which teaches, with or without fees, compensation or other charges therefor, any language other than the English language, as a course of study, to two or more persons as a group, as a regular and customary practice."

The Hawaiian statute prohibits the teaching of any language other than English in such manner to *all* children who have not passed the first four grades of public or private attendance. Such attendance is required in the school year after the child has reached six years of age. Haw.Rev.L.Sec. 1830. This means that no parent may have his child so taught before he has attended any public school and thereafter up to ten years of age at least. It is up to a later age if for sickness or some other reason he has not then passed the fourth grade. Thereafter the child must pass *each* succeeding grade through the eighth with a score "not lower than normal" or reach the age of fifteen before he may so be taught a foreign language.[2]

Since the testimony is that a very large number of Hawaiian children of fifteen seek their own living and support at that age, it is apparent that as to most of them their parents must have taught them a foreign language before that time if one is to be acquired.

Defendants claim that we should not construe the definition of a school as applying to a Chinese speaking mother who daily teaches her two children the language of the home. Assuming this true, it certainly would apply to a religious Chinese descended mother having an educated cousin teach two of her children in her home the truths of Confucius, even orally, explaining the words of that spiritual guide in the language in which they are spoken and are recorded.

The parents' right to have their offspring taught a foreign language is one of the fundamental rights guaranteed by the due process clause of the Fifth and Fourteenth Amendments. A teacher of such languages in a Nebraska public school to children in the eighth grade or below cannot be deprived by the state legislature of the right to pursue that vocation. Meyer v. State of Nebraska, 262 U.S. 390, 400, 43 S. Ct. 625, 67 L.Ed. 1042, 29 A.L.R.1446. The Supreme Court reversed a judgment denying an injunction restraining state officials from enforcing the above Nebraska law against such a teacher. Nebraska District, etc., v. McKelvie sub. nom. Bartels v. State of Iowa, 262 U.S. 404, 411, 43 S.Ct. 628, 67 L.Ed. 1047.

The Circuit Court of Appeals for the Ninth Circuit held that an injunction should be granted against the enforcement of a Hawaiian statute regulating foreign language schools. In so doing it based its opinion on the following statement of the natural law of the relationship of parent and child from an opinion of Mr. Justice Harlan in Berea College v. Commonwealth of Kentucky, 211 U.S. 45, 67, 68, 29 S.Ct. 33, 63 L.Ed. 81. "'The capacity to impart instruction to others is given by the Almighty for beneficent purposes and its use may not be forbidden or interfered with by government—certainly not, unless such instruction is, in its nature, harmful to the public morals or imperils the public safety. The right to impart instruction, harmless in itself or beneficial to those who receive it, is a substantial right of property, especially, where the services are rendered for compensation. But, even if such right be not strictly a property right, it is, beyond question, part of one's liberty as guaranteed against hostile state action by the Constitution of the United States. This court has

---

[2] "Sec. 1873. Requirements for pupil. No child shall be taught a foreign language in any school unless he shall comply with one of the following requirements: (a) That he shall have passed the fourth grade in public school or its equivalent, and shall pass from time to time in each succeeding grade a standard test in English composition and reading conducted by or under the direction of the department of public instruction attaining a score not lower than normal for his grade; or (b) that he shall have passed the eighth grade in public school or its equivalent; or (c) that he shall have attained the age of fifteen years. [L.1943, c. 104, s. 3.]"

more than once said that the liberty guaranteed by the Fourteenth Amendment embraces "the right of the citizen to be free in the enjoyment of all his faculties," and "to be free to use them in all lawful ways." * * * If pupils, of whatever race—certainly, if they be citizens—choose with the consent of their parents or voluntarily to sit together in a private institution of learning while receiving instruction which is not in its nature harmful or dangerous to the public, no government, whether federal or state, can legally forbid their coming together, or being together temporarily for such an innocent purpose.'" Farrington v. Tokushige, 9 Cir., 11 F.2d 710, 713, 714. On certiorari the Supreme Court, 273 U.S. 284, pages 298, 299, 47 S.Ct. 406, at page 409, 71 L.Ed. 646, sustained that decision, stating.

"* * * Enforcement of the act probably would destroy most, if not all, of them [the schools]; and, certainly, it would deprive parents of fair opportunity to procure for their children instruction which they think important and we cannot say is harmful. The Japanese parent has the right to direct the education of his own child without unreasonable restrictions; the Constitution protects him as well as those who speak another tongue. * * *

"The general doctrine touching rights guaranteed by the Fourteenth Amendment to owners, parents and children in respect of attendance upon schools has been announced in recent opinions. Meyer v. [State of] Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446; Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047; Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468. While that amendment declares that no state shall 'deprive any person of life, liberty, or property, without due process of law,' the inhibition of the Fifth Amendment, 'No person shall * * * be deprived of life, liberty, or property, without due process of law,' applies to the federal government and agencies set up by Congress for the government of the territory. Those fundamental rights of the individual which the cited cases declared were protected by the Fourteenth Amendment from infringement by the states, are guaranteed by the Fifth Amendment against action by the territorial Legislature or officers."

Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468, so relied upon in the Farrington case, sustained an injunction against enforcement of an Oregon statute forbidding the general education of children in Catholic schools. In granting such an injunction to such a school corporation the Court stated at page 535, of 268 U.S., at page 573, of 45 S.Ct.,

"* * * The fundamental theory of liberty upon which all governments in this Union repose excludes any general power of the state to standardize its children by forcing them to accept instruction from public teachers only. The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.

"Appellees are corporations, and therefore, it is said, they cannot claim for themselves the liberty which the Fourteenth Amendment guarantees. Accepted in the proper sense, this is true. Northwestern [Nat.] Life Ins. Co. v. Riggs, 203 U.S. 243, 255, 27 S.Ct. 126, 51 L.Ed. 168, 7 Ann.Cas. 1104; Western Turf Association v. Greenberg, 204 U.S. 359, 363, 27 S.Ct. 384, 51 L. Ed. 520. But they have business and property for which they claim protection. These are threatened with destruction through the unwarranted compulsion which appellants are exercising over present and prospective patrons of their schools. And this court has gone very far to protect against loss threatened by such action. Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A., 1916D, 5, 45, Ann.Cas. 1917B, 283; Truax v. Corrigan, 257 U.S. 312, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L. Ed. 255.

"The courts of the state have not construed the act, and we must determine its meaning for ourselves. * * *"

As in the case last cited, the Territorial courts of Hawaii, as the Oregon courts in the Society of Sisters case, "have not construed [the language school] act, and we must determine its meaning for ourselves."

It should be noted, however, that to the fundamental *parental right* to secure for a child a foreign language so recognized in the Berea College and the Society of Sisters cases—that is in the American isolationist period between 1909 and 1926—in today's world of the United Nations there has been added an equally profound *international need* for understanding between the peoples of a world of different tongues.

The defendants contend that in so construing the Hawaiian Act it must be done in the light of the Act's legislative finding concerning a harmful condition respecting the "average" Hawaiian school child. In this connection the case of Farrington v. T. Tokushige, supra, recognizes, at page 299 of 273 U.S., 47 S.Ct. 406, 71 L.Ed. 646, that exceptional language conditions prevail among Hawaiian children, warranting their pedagogical control within the limits of the Constitution. The legislative finding relating to the "average" of Hawaiian children is as follows: "Sec. 1871. Declaration of legislative findings. It is hereby declared that the study and persistent use of foreign languages by children of *average* intelligence in their early and formative years definitely detract from their ability properly to understand and assimilate their normal studies in the English language, which are required by law to be pursued by all children of school age, and definitely retard their progress in understanding and assimilating such studies; that the study and persistent use of such foreign languages in such early and formative years may and do, in many cases, cause serious emotional disturbances, conflicts and maladjustments; that the teaching of foreign languages compels and encourages the study and persistent use of such foreign languages, to the detriment, as aforesaid, of children in their early and formative years, that it is to the best interest, and will best promote the health and welfare, of children of tender age that such foreign language studies not be undertaken until each child shall have completed and passed at least the fourth grade or shall have attained the age of nine years, unless such child is earlier able to speak, write and read the English language and has attained a test score of at least 5.0 on standard tests in composition and in reading; and that the teaching and study of foreign language to and including the eighth grade or the age of fifteen years should be regulated in the public interest to avoid the detrimental results herein set forth to which end each of the provisions of this chapter are enacted. [L.1943, c. 104, s. 1.]"

This finding regarding such "average" children is supported by the evidence. In brief, it is that in many instances Hawaiian children are required to frame their thoughts and to express them in three distinct languages. One is the language of the home, where a child, say of Portugese parents, has all his intimate home activities in Portugese. Another is what is called "pidgin," an extension of that lingua franca of the China, South Asiatic and Malayan coast cities in which the foreign residents conduct their personal and commercial relations with the lesser educated resident nationals. To this the Hawaiian people have added words and phrases assimilated from the Portugese, Hawaiian and Koreans. The testimony is that much of the intercommunication of children from homes where a foreign language is spoken is in this pidgin and that even some teachers use it in clarifying English words to their pupils. The third language is English.

With many of the children so using the three languages, the testimony of the defendants is that there is in the sixth grade a retardation in accomplishment of the school's curriculum of over six month's behind that of similar schools on the mainland. The parties dispute as to the major causa causans. Plaintiffs, while not contesting the retardation, contend that pidgin and not the language schools is the principal cause. Defendants claim it is because of the language schools.

There are many Hawaiian Catholic parochial schools with complete educational courses, attendance in which is an equivalent to that of the regular public schools. The defendants state the Act interdicts the teaching of even Latin or Greek to the children of the age and scholastic standing it seeks to affect, and we agree.

Before the attack on Pearl Harbor there were large schools teaching the Chinese

and Japanese languages in the afternoon, after the regular schools had adjourned. These schools ceased teaching during the war. There is testimony that all of such Japanese schools have been permanently abandoned. Their buildings were voluntarily turned over to the government or charity organizations. The Chinese school plaintiffs now seek to resume such late afternoon teaching.

The extent of the education of children in the Chinese language prior to the war with Japan is shown by the admission of the defendants' answer that there were eight such schools employing more than fifty teachers. It is a proper inference that the three plaintiff schools seeking to resume teaching will have many pupils of above the average intelligence of the legislative finding.

The Act with its finding and prohibitory provisions shows on its face a denial of the right to acquire a foreign language to that half, or nearly half, of Hawaiian children of more than "average intelligence." Reinforcing this is the testimony of defendants' principal pedagogical expert that some children from homes speaking a foreign language "are so far behind the others that if our teachers are to have a chance to bring them up to standard, up to standard of the mainland, they can't have the additional handicap of trying to learn another language or else they will never—or else too many of them will never speak good English. *Of course, the bright ones will.* But the children who are about the average, *about half of the children in any group are below average,* so they can't do it with that. * * *" (Emphasis supplied.)

In Hawaii there were 22,357 children in the first four grades. Construing the word "average" in its customary meaning as being derived from those above and below a standard, of these at least 10,000 above average intelligence, the brighter ones, are denied the right then to begin to acquire a foreign language even with a tutor at home.

We do not agree with the defendants that such a denial to the parents of such a large proportion of children of the constitutional right to secure a foreign language for them is warranted to secure the elimination of the harm it seeks to avoid for those of lesser ability. It is for the brighter ones that there is the greater gain in such attainment—a gain not only in personal mental growth and satisfaction and in increased business opportunities but, now, in opportunities in service to his government's need of foreign language experts in its international intercourse.

■ Where such a fundamental right is destroyed by statute, it is not incumbent upon the wronged party to show that it could have been drawn so as to prevent the evil sought to be cured in the conduct of others. Thornhill v. State of Alabama, 310 U.S. 88, 99, 60 S.Ct. 736, 84 L.Ed. 1093, and cases there cited. Hence we are not required to explore the area of legislation in which pedagogical standards may be created by which these children of average and less than average intelligence could be segregated from the others and such prohibitory restraint applied to them.

■ While it is apparent that the three plaintiff schools will have pupils of above such average intelligence and hence would be deprived of their constitutional right, its fundamental character gives them the right to contest the legislation even if they were not shown to be about to teach such pupils. It is enough that the statute shows on its face such an invalid deprivation. Thornhill v. State of Alabama, supra, 310 U.S. 101, 60 S.Ct. 736, 84 L.Ed. 1093; Lovell v. City of Griffin, 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949; Smith v. Cahoon, 283 U.S. 553, 562, 51 S.Ct. 582, 75 L.Ed. 1264; Schneider v. New Jersey State, 308 U.S. 147, 161, 60 S.Ct. 146, 84 L.Ed. 155.

■ There is no merit in defendants' contention that under the saving clause of the statute[3] it is inapplicable to plaintiffs or that it contemplates an enforcement only

---

[3] "Section 7. [Saving clause.] If any portion of this Act, or the application thereof to any person or circumstance, shall be held to be unconstitutional or invalid, the remainder of this Act, or the application of such portion to other persons and circumstances, shall not be affected."

against children of average intelligence. It applies to *all* persons systematically teaching two pupils and to *all* children as well as those of average or less than average intelligence. Its provisions are not divisible in either of those essential respects.

We hold and declare the statute to violate the due process clause of the Fifth Amendment and order the issuance of the injunction prayed for.

McCORMICK and METZGER, JJ., concur.

## Opinion Re Applicability of Section 266 Judicial Code.

McCORMICK, District Judge.

By the amended complaint in this action, three eleemosynary corporations duly organized for the purpose of conducting schools in the Territory of Hawaii for the education of children in the Chinese language, a pursuit they had been lawfully carrying on long prior to certain territorial legislation in part embodied in the Revised Laws of Hawaii, 1945, as chapter 31, jointly with three personal plaintiffs, citizens of the United States of Chinese lineage and residents of the Territory of Hawaii seek an injunction to restrain appropriate territorial executive officers from enforcing provisions of Chapter 31, upon the ground that the questioned territorial legislation is unconstitutional and violative of the plaintiffs' liberty and property without due process of law in contravention of the 5th Amendment.

Subsequent to the denial of plaintiffs' motion for a preliminary injunction by the District Judge presiding at the time and pursuant to the request of the plaintiffs stated in the amended complaint and confirmed in open court by the express desire of defendants, three accredited federal judges designated by District Judge Metzger, before whom the cause was then pending, assembled to finally hear and determine the suit in the District Court established in the Territory of Hawaii by Sec. 86 of the Hawaiian Organic Act, as amended. Title 48, Sec. 641 et seq., U.S.C.A.

At the outset of proceedings the suggestion was made that the three judge procedure in the federal courts is not applicable to the District Court established by Congress in the Territory of Hawaii and was therefore inoperative in the instant suit. Such suggestion poses an important and crucial question in the case at bar, namely, whether Sec. 266 of the Judicial Code of the United States, as amended, Title 28, Sec. 380, U.S.C.A., is applicable in the District Court in the Territory of Hawaii. We are of the opinion that it is applicable to the situation before the Court in the suit at bar.

The Supreme Court had before it in Farrington v. T. Tokushige, 1927, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646, a situation to an extent similar to the instant proceeding in that there was involved an application for an interlocutory injunction to restrain territorial executive officers of Hawaii from attempting to enforce a Hawaiian territorial legislative act relating to foreign language schools. In that case, the Court impliedly decided that the District Judge had jurisdiction to hear and determine the right to an interlocutory injunction. However, even if it be assumed that the three judge requirement in section 266 of the Judicial Code was thereby held to be not applicable to the proceedings in the District Court in Hawaii there under consideration, we think such conclusion does not solve the problem before us at this time.

Here we are dealing with the Statute as Amended, 43 Stat. 938, which in pari materia states " 'The requirement respecting the presence of three judges shall also apply to the final hearing *in such suit* in the district court; and a direct appeal to the Supreme Court may be taken from a final decree granting or denying a permanent injunction *in such suit.*' " And here we must also consider the question in the light of procedural innovations specifically established and currently relating to the district court of the United States for Hawaii. Title 48, Sec. 646, U.S.C.A.

Support of the argument of inapplicability of the three judge "procedural protection" against single judge injunctive process in the district court in Hawaii is predicated upon decisions pertaining to judicial procedures in Puerto Rico. Benedicto v. West India & Panama Telegraph

Co., 1 Cir., 1919, 256 F. 417; Munoz v. Porto Rico Ry., etc., Co., 1 Cir., 1936, 83 F. 2d 262. We think there is a wide difference between the basic governmental structure and identity of Hawaii and Puerto Rico. In the latter "possession" only certain statutory laws of the United States are applicable therein. Title 48, Sec. 734, U.S.C.A., whereas in the "territory" of Hawaii, The Constitution, and all the laws of the United States which are not locally inapplicable, are effective identically as "*elsewhere*" in the United States. Title 48, Sec. 495, U.S. C.A.

Indeed, the clear and basic governmental differences in the two political units and in their respective judiciaries is recognized as far back as 1919 where the Court of Appeals in the Benedicto decision stated [256 F. 419]: "We have no occasion to inquire whether section 266 might not apply to continental territories more closely related to the United States than that of the possession, or quasi territory, of Puerto Rico." Moreover, the Supreme Court in Balzac v. People of Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627, and in Downes v. Bidwell, 182 U.S. 244, at page 305, 21 S.Ct. 770, 45 L.Ed. 1088, so conclusively distinguishes the governmental characteristics of Puerto Rico and of Hawaii as to make the decisions relating to courts in Puerto Rico of no application whatever to the question under consideration in this Court.

All pertinent adjective prerequisites specified by the Supreme Court in Ayrshire Collieries Corporation v. United States, 331 U.S. 132, 67 S.Ct. 1168, and in Farrington v. T. Tokushige, supra, necessary to make operative three judge participation in the instant suit have occurred. An interlocutory injunction has been sought and passed to a hearing in the District Court at Honolulu and a substantial federal question of transcending limitations of the 5th Amendment to the Constitution has been sufficiently alleged in the Amended Complaint.

In our opinion, discussion of any different elements between "constitutional" and "legislative" courts is entirely beside the point of our inquiry and is a mere abstraction.

The suit at bar from its inception has been at all times in the same forum, namely in the District Court established in the Territory of Hawaii by the Congress of the United States. The jurisdiction of such Court, in the sense of its right and power to hear and determine causes and proceedings has been explicitly stated by the creative authority to be that of "district courts of the United States," no more and no less, and it is expressly required by Statute to proceed in the same manner as a United States District Court. Title 48, Sec. 642, U.S.C.A.

Undoubtedly, a statute which departs from the procedure traditionally employed in single judge tribunals, as Section 266 of the Judicial Code does, should in applicable situations be given "narrowness of its original scope", Phillips v. United States, 312 U.S. 246, at page 251, 61 S.Ct. 480, at page 483, 85 L.Ed. 800, and must be construed "as an enactment technical in the strict sense of the term and to be applied as such" but if it be admitted, as it must, that the District Court in Hawaii has jurisdiction to consider and decide suits seeking to have territorial legislative acts declared unconstitutional, it does violence to the Congressional intent, if not to the words used in the last sentence of Amended Section 266, to hold that the federal district judges in Hawaii have prerogatives and larger powers to enjoin statutes of general application in the sensitive local area involved than those of other federal courts. We think such construction is not imperative and in the light of the language used, and the manifest congressional intent, it should be avoided.

■ Nor do we think that there is any need to philosophize or surmise why Congress, in dealing with situations in Hawaii, invested or restricted Courts which it continued or established there, or which it established in other territories or possessions of the United States, with dissimilar procedural methods in disposing of injunction applications which seek to restrain the operation or enforcement of territorial Statutes upon the ground of repugnancy to the Constitution of the United States. There can be no doubt that Congress has paramount and plenary authority to legis-

late in all matters appropriate to the people of the territory of Hawaii—Inter-Island Steam Nav. Co. v. Territory of Hawaii, 305 U.S. 306, 59 S.Ct. 202, 83 L.Ed. 189.

If there had been any reason in the Farrington v. T. Tokushige litigation to doubt that the intent of Congress that the scope and composition of the District Court of the United States for Hawaii should be, with relation to provisional or final remedies in suits for injunction to restrain local legislation upon the ground of unconstitutionality, the same as in Federal District Courts throughout the States, the uncertainty has been expressly and clearly removed by subsequent specific Congressional legislation. Title 48, Section 646, U.S.C.A., Federal Rules of Civil Procedure, rules 1, 65(e), 28 U.S.C.A. following section 723c.

There being no authoritative ruling to the contrary, there is sound reason to conclude that the "mischief" which Congress sought to remedy by enacting and amending Section 266 of the Judicial Code impends in Hawaii similarily as it does in the States.

The chief obstacle to apply the "procedural protection" of Section 266 of the Judicial Code to Hawaii appears to be the repetitive use of the word "State" in the Statute. But we think that when the civic aspects of the situation are considered, the "procedural protection" of the public interest in the mind of the law-making agency connotes a meaning of any separate political community such as the Territory of Hawaii as well as those political subdivisions of the Nation known as States of the Union.

In Talbott v. Board of Com'rs Silver Bow County, 1890, 139 U.S. 438, 11 S.Ct. 594, 35 L.Ed. 210, the Supreme Court had occasion to interpret the meaning of the word "State" in an Act of Congress relating to the right of the Territory of Montana to assess a tax on National Bank Stock —whereas under the literal terms of the Act in question, only "States" were given authority to tax such stock.

In holding that the territories possess the same power of taxing National Banks which States enjoy the Court said at page 441 of 139 U.S., at page 595 of 11 S.Ct., 35 L.Ed. 210: "In this section no express reference is made to territories; states only are mentioned. Tested by the letter, the argument is short and clear. Congressional permission is essential; no permission is given to the territories; therefore, territorial taxation is unauthorized and void. Whatever may be the voice of the letter, the argument fails because the minor premise cannot be sustained. Can it be that congress meant to give power to the states to tax, and to withhold that power from the territories? Some plausible reason should be suggested before the intention is imputed to congress of granting to an independent jurisdiction, such as a state, the power to tax one of its own instrumentalities, and at the same time withhold a like power from a political organization like that of a territory, wholly dependent upon congress, and subject to its absolute supervision and control. Such is not the ordinary lesson of experience. If the matter in respect to which such an intent was imputed were wholly of interest to the states, or designed purely for the exercise of powers within the states, then properly all general expressions in the statute might be limited to states, and the intent of congress be supported and established by the character of the subject-matter of the legislation. The converse of this is true. The national banking system was national in its design, coextensive in its operation with the territorial limits of the United States, and intended to be the banking system for the whole country, territories as well as states."

When we examine the several provisions of the Organic Act of Hawaii relating to the District Court, its jurisdiction, grant and limitation of powers, manner of appeals therefrom and the concomitant Rules of Federal Procedure operative therein, we perceive a unitary judicial system functioning, except as to tenure of the Judges, precisely as in the several States, and we conclude, in line with the reasoning of the court in the Talbott case, that the word "State" in Section 266 of the Judicial Code, as amended, is not intended by Congress as in contradistinction to the Territory of Hawaii but on the contrary the

requirement respecting the presence of three judges is mandatory in the suit at bar in the district court of the United States for Hawaii.

It is so ordered.

METZGER, J., concurs.

DENMAN, Circuit Judge (dissenting).

The question here is whether Congress in enacting Judicial Code, Section 266, as amended, 28 U.S.C. 380, 28 U.S.C.A. § 380, conferred on the territorial district courts created by it in Hawaii and Alaska the jurisdiction to act as three-judge tribunals in suits to enjoin territorial officers from enforcing territorial laws alleged to violate the Federal Constitution.

I dissent from the court's holding that Congress gave jurisdiction in such cases under Section 266 to its territorial courts. The Supreme Court in a series of decisions, culminating in Phillips v. United States, 312 U.S. 246, 248 et seq., 61 S.Ct. 480, 483, 85 L.Ed. 800, holds that Section 266 is not "a measure of broad social policy to be construed with great liberality, but as an enactment technical in the strict sense of the term and to be applied as such." It is there stated that that section is to be construed to avoid "a serious drain upon the federal judicial system *particularly in regions where, despite modern facilities, distance still plays an important part in the effective administration of justice.* (Emphasis supplied.) Unless it be strictly construed "§ 266 would defeat the purposes of Congress, as expressed by the Jurisdictional Act of February 13, 1925, to keep

within narrow confines our appellate docket. Moore v. Fidelity & D. Co., 272 U.S. 317, 321, 47 S.Ct. 105, 106, 71 L.Ed. 273. * * * "1

Briefly summarized, my dissent is to the court's failure to give a strict interpretation of Section 266 to the end that it will minimize the drain on the service to litigants of federal judges in drawing them to distant places and away from their resident courts and "keep within narrow confines * * * [the Supreme Court's] appellate docket."

No case could better than this illustrate the drain on federal judicial power in taking judges to distant regions. District Judge McCORMICK and myself in travel to and from Hawaii in the trial and subsequent conferences have been taken for several weeks from our needed services to our litigants in our respective courts. Also Judge METZGER spent several weeks in travel from Hawaii to and from San Francisco and in necessary conferences with us on the mainland. One of Hawaii's two district judges, Judge McLaughlin, was disqualified, thus requiring the calling from the mainland of Judge McCORMICK to complete a three-judge tribunal. Judge McCORMICK'S court in the Southern District of California is so overcrowded with litigation that the Ninth Circuit Conference at its meeting in July 1947 requested of Congress that another judgeship be created for that district.

The court's opinion in so failing to apply the rule of the Phillips case has caused it (a) to insert in Section 266 the words "or territory" after its eleven words "state"

---

1 So also in the recent case of Ayrshire Collieries Corporation v. United States, 331 U.S. 132, 67 S.Ct. 1168, 91 L.Ed. ——, where, under an analogous three-judge statute, three judges heard and had submitted to them the merits of the case. Because of illness, but two participated in the subsequent decision. Applying the rule of strict technical construction of the Phillips case the Supreme Court reversed, holding that the statute required that the cause not only should be heard but that it should be determined by three judges.

Other cases of strict construction of such a three-judge statute are Gully v. Interstate Nat. Gas Co., 292 U.S. 16, 18,

54 S.Ct. 565, 78 L.Ed. 1088; Oklahoma Gas & Electric Co. v. Oklahoma Packing Co., 292 U.S. 386, 54 S.Ct. 732, 78 L. Ed. 1318; Moore v. Fidelity & Deposit Co., 272 U.S. 317, 47 S.Ct. 105, 71 L.Ed. 273; Smith v. Wilson, 273 U.S. 388, 47 S.Ct. 385, 71 L.Ed. 699; Ex parte Collins, 277 U.S. 565, 48 S.Ct. 585, 72 L. Ed. 990; Ex parte Williams, 277 U.S. 267, 48 S.Ct. 523, 72 L.Ed. 877; Ex parte Public National Bank, 278 U.S. 101, 49 S.Ct. 43, 73 L.Ed. 202; Rorick v. Board of Com'rs of Everglades Drainage Dist., 307 U.S. 208, 59 S.Ct. 808, 83 L.Ed. 1242; Ex parte Bransford, 310 U.S. 354, 60 S.Ct. 947, 84 L.Ed. 1249.

and · (b) to construe the words "district court of the United States" not in their strict historical meaning as a constitutional court but to expand the phrase broadly to include territorial courts.

Particularly I disagree with this court's interpretation of the phrase "such suit" of the terminal clause of Section 266, cited in the fifth paragraph of its opinion. When the pertinent omitted portions of the section are included, the only questions here for consideration are made clear. That section provides "(Judicial Code, section 266, amended.) Same; alleged unconstitutionality of State statutes; appeal to Supreme Court. No interlocutory injunction suspending or restraining the enforcement, operation, or execution of any statute of a *State* by restraining the action of any officer of such *State* in the enforcement or execution of such statute, or in the enforcement or execution of an order made by an administrative board or commission acting under and pursuant to the statutes of such *State,* shall be issued or granted by any justice of the Supreme Court, or by any *district court of the United States,* or by any judge thereof, or by any circuit judge acting as district judge, upon the ground of the unconstitutionality of such statute, unless the application for the same shall be presented to a justice of the Supreme Court of the United States, or to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a justice of the Supreme Court or a circuit judge, and the other two may be either circuit or district judges, and unless a majority of said three judges shall concur in granting such · application. Whenever such application as aforesaid is presented to a justice of the Supreme Court, or to a judge, he shall immediately call to his assistance to hear and determine the application two other judges: Provided, however, That one of such three judges shall be a justice of the Supreme Court, or a circuit judge. Said application shall not be heard or determined before at least five days' notice of the hearing has been given to the governor and to the attorney general of the *State,* and to such other persons as may be defendants in the suit: * * * It is further provided that if be-

fore the final hearing of such application a suit shall have been brought in a court of the *State* having jurisdiction thereof under the laws of such *State,* to enforce such statute or order, accompanied by a stay in such *State* court of proceedings under such statute or order pending the determination of such suit by such *State* court, all proceedings in any court of the United States to restrain the execution of such statute or order shall be stayed pending the final determination of such suit in the courts of the *State.* Such stay may be vacated upon proof made after hearing, and notice of ten days served upon the attorney general of the *State,* that the suit in the *State* courts is not being prosecuted with diligence and good faith. The requirement respecting the presence of three judges shall also apply to the final hearing in such suit in the district court; and a direct appeal to the Supreme Court may be taken from a final decree granting or denying a permanent injunction in such suit."

A. *The word "state" as used in Section 266 should be given a strict interpretation as applying to states in their sovereign capacity and hence not including such Territories as Hawaii and Alaska.*

The phrases "such suit" of the terminal clause of Section 266 refer to suits concerning action of a "state" as that word is used in its preceding eleven phrases: 1. "Statute of a State" 2. "officer of such State" 3. "pursuant to the statutes of such State" 4. "to the governor and to the attorney general of the State" 5. court of the State having jurisdiction thereof" 6. "under the laws of such State" 7. "a stay in such State courts" 8. "such State court" 9. "the courts of the State" 10. "the attorney general of the State" 11. "the suit in the State courts". Nothing could be further from a strict construction of these phrases than this court's decision which requires the addition of the words "or territory" to each of them.

Entirely apart from this violation of the rule of strict construction of the Phillips and other cases, supra, the Mann Elkins Act of 1910, 36 Stat. 539 et seq., in which, in Section 17, Congress created the first functioning of the three-judge court of later Section 266, shows the contrary intent

in its phraseology. In Section 17 the word "territory" does not appear. Elsewhere in that Act, in Sections 7, 11 and 12, 49 U.S.C.A. §§ 1 (1–9), 13, 15, the word "territory" is used in connection with the word "state" whenever that Act includes a territory within its provisions.

This court's opinion explains its disregard of the rule of strict construction of the Phillips case by stating that "the 'mischief' which Congress sought to remedy by enacting and amending Section 266 of the Judicial Code impends in Hawaii similarly as it does in the States." The Supreme Court disposed to the contrary a similar contention with respect to Section 266 in Ex parte Collins, 277 U.S. 565, 567, 48 S.Ct. 585, 72 L.Ed. 990. There was the same claimed unconstitutional "mischief" in the enforcement by municipal officers of a state statute. It was claimed, as here, that the words officers of a state should be given a broad meaning to *include* officers of a municipality of *a state*. The contention was rejected by the Supreme Court stating "The suit is not one to restrain 'the enforcement, operation, or execution' of a statute of a state within the meaning of section 266. That section was intended to embrace a limited class of cases of special importance and requiring special treatment in the interest of the public." It is the action of a state in its *sovereign* capacity and not the action of lesser political subdivisions, such as counties, municipalities, and, here, territories, which lack such sovereign capacity, with which Section 266 is concerned. The Court, at page 567, of 277 U.S., at page 586 of 48 St., 72 L.Ed. 990, quotes and relies upon what Senator Burton said of the amendment to the Commerce Court Act which later became Section 266: "It evidently recognizes the superior degree of consideration and sanction which should be given to a state statute, and prevents hasty interference with the action of a sovereign state." 45 Cong.Rec. 7253.

It is obvious that many municipalities created by state legislatures have a larger population and greater property than the Territory of Hawaii. The mischief of unconstitutional action well could be greater when caused by such municipal officers than

that by the territorial officers. Yet, the Supreme Court says (page 568, of 277 U.S., page 586 of 48 S.Ct., 72 L.Ed. 990), "Despite the generality of the language, we think the section must be so construed" that it does *not apply* to the acts of officers of a state's municipality.

In view of the Phillips case it is unnecessary to review the many cases in which statutes containing the word "state" have been broadly or narrowly construed. A broad construction of the word "state" was given in the early decision of Talbott v. Board of Com'rs of Silver Bow County, 1891, 139 U.S. 438, 11 S.Ct. 594, 35 L.Ed. 210, the sole case relied upon in this respect in this court's opinion. There it was held to include the Territory of Montana in a statute giving states the power to assess a tax upon national bank stock.

In contrast, in a strict interpretation of the word "state," is the subsequent decision of Wynne v. United States, 217 U.S. 234, 242, 30 S.Ct. 447, 54 L.Ed. 748. There the Supreme Court held that the Territory of Hawaii was not included in the word "state" in a statute (R.S. § 5339, 18 U.S. C.A. § 1452) providing for jurisdiction in federal courts in cases of murder committed within the "admiralty and maritime jurisdiction of the United States, 'and out of the jurisdiction of any particular state.'" The defendant in that case was tried in this court and found guilty of murder committed on a vessel while at anchor in Honolulu Harbor. The Supreme Court held that under this statute the word "state" did not include the Territory of Hawaii and that the harbor of Honolulu was outside the jurisdiction of any state.

The holding in the Wynne case is of greater significance because it distinguishes the liberal interpretation of the word "state" in the Silver Bow County case, stating that that decision "was based upon the obvious intent of Congress, looking to the scope and purpose of the act," whereas the Congressional intent of R.S. § 5339, providing for the jurisdiction of this particular territorial court, is given a strict interpretation of the word "state" as excluding the Territory of Hawaii.

In accord with the decision of Ex parte Collins that Section 266 is confined to un-

constitutional actions by states in their sovereign capacities and does not include the action of lesser political subdivision, such as distant island territories, is the decision of the First Circuit in Benedicto v. West India & Panama Telegraph Co., 256 F. 417. There the court held that Section 266 has no application to the issuance of an interlocutory injunction restraining the enforcement upon constitutional grounds of an order of the Public Service Commission of Puerto Rico. The reasoning of the court is that the maintenance of the relationship of the states, as "independent sovereignties," to the United States is the purpose of this legislation. As stated by the court at page 419 of 256 F., "We think the leading idea of Congress was in deference to the supposed independent jurisdiction of states, as such, and to safeguard their laws against hasty and inconsiderate federal interference." Again quoting the court at page 419 of 256 F., "* * * we think that the provision in respect to three judges [Section 266] has reference to state statutes and Constitutions, because of the independence and peculiar relationship of the states to the federal government, and not to Porto Rico, and because the administration there of the three-judge provision would be locally inconvenient and practically inapplicable, and because it is not clear that Congress intended that interlocutory injunction questions should require the presence of three judges in primary equity proceedings in that Island."

B. *The strict construction of the Phillips case requires the words of Section 266 "district court of the United States" to be confined to constitutional district courts in the states and not to be liberally extended to include territorial district courts.*

This court's opinion contends that because Congress in 48 U.S.C. 642, 48 U.S.C.A. § 642, has given the district court of the Territory of Hawaii the same jurisdiction and powers as the constitutional courts in the states, the two classes of courts are in all respects identical. It ignores the contention, and cases supporting it, vigorously presented to us by the brief of the Bar Association of Hawaii,[2] that such identity of jurisdiction and powers does not make a territorial court a constitutional court.

Even in the absence of the established strict construction for Section 266 and considering the question de novo, the phrase "district court of the United States" *without an addition expressing a wider connotation* does not include territorial courts.

Mookini v. United States, 303 U.S. 201, 205, 58 S.Ct. 543, 545, 82 L.Ed. 748, was decided thirteen years after Congress enacted the present terminal clause of Section 266 upon which this court bases its opinion. There the question was whether the territorial court of Hawaii is included in the term "District Courts of the United States." The Supreme Court held it was not, stating "The term 'District Courts of the United States,' as used in the rules, *without an addition expressing a wider connotation,* has its historic significance. It describes the constitutional courts created under article III of the Constitution. Courts of the Territories are legislative courts, properly speaking, and are not District Courts of the United States. We have often held that vesting a territorial court with jurisdiction similar to that vested in the District Courts of the United States does not make it a 'District Court of the United States.' Reynolds v. United States, 98 U.S. 145, 154, 25 L.Ed. 244; The City of Panama, 101 U.S. 453, 460, 25 L.Ed. 1061; In re Mills, 135 U.S. 263, 268, 10 S.Ct. 762, 34 L.Ed. 107; McAllister v. United States, 141 U.S. 174, 182, 183, 11 S.Ct. 949, 35 L.Ed. 693; Stephens v. Cherokee Nation, 174 U.S. 445, 476, 477, 19 S.Ct. 722, 43 L.Ed. 1041; Summers v. United States, 231 U.S. 92, 101, 102, 34 S.Ct. 38, 58 L.Ed. 137; United States v. Burroughs,

---

[2] The court requested the Bar Association to act as amicus curiae and brief for us the law with respect to the applicability of Section 266 to the territorial district courts. In response a very able brief was prepared and presented to us by the Association's president, Mr. J. Russell Cades, and Mr. Edward Z. Buck. The brief, which covered much more of the historical development of Section 266 than does this dissent, has been of great assistance to its writer, who agrees with the argument and conclusions of these friends of the court.

289 U.S. 159, 163, 53 S.Ct. 574, 77 L.Ed. 1096. * * *"

So also of the Territory of Alaska. In its Enabling Act of 1884, 23 Stat. 24, the Alaska district court was given "the civil and criminal jurisdiction of district courts of the United States." One McAllister, appointed to the Alaska district court by and with the consent of the Senate was removed by President Cleveland under a statute (R.S. § 1768) giving him the power to suspend any civil officer so appointed "except judges of the courts of the United States." McAllister sued for his salary claiming that he remained in office because the district court of the Alaska territory is one of "the courts of the United States," from which he could not be so suspended by the President. In McAllister v. United States, 141 U.S. 174, 11 S.Ct. 949, 951, 35 L.Ed. 693, the Supreme Court denied him his salary. It held that, although the Alaska court was "invested with the powers of a district court and a circuit court of the United States as well as with general jurisdiction to enforce in Alaska the laws of Oregon" (page 179 of 141 U.S., page 952 of 11 S.Ct., 35 L.Ed. 693), it was not one of the "courts of the United States" since that phrase was used in Section 1768 "with reference to the recognized distinction between courts of the United States and merely territorial or legislative courts." Page 185 of 141 U.S., page 953 of 11 S.Ct., 35 L.Ed. 693.

This court of three judges should have held that Section 266 gave it no power to proceed with the instant litigation. The case should have been tried by a single judge as in the case of Farrington v. T. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646, where a similar Hawaiian school law was held unconstitutional. While the question of jurisdiction of the single judge was not raised in that case, I am of the opinion that no error of the Supreme Court in that regard lurked in its record.

Since the court's decision, at least for the time being, is the law of the case, I am required by the Ayrshire case, supra, to participate in the adjudication of the merits of the challenge of the constitutionality of the territorial statute.